Present: All the Justices

BOARD OF SUPERVISORS
OF ROCKINGHAM COUNTY

                                        OPINION BY
v.  Record No. 003006        CHIEF JUSTICE HARRY L. CARRICO
                                      January 11, 2002
WILLIAM S. STICKLEY

            FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
                        John J. McGrath, Jr., Judge

     This is an appeal in a zoning case, and the dispositive

question is whether a fairly debatable issue was presented by

the decision of the Board of Supervisors of Rockingham County to

deny William S. Stickley a special use permit to raise and

release game birds on his farm.  The trial court found the issue

was not fairly debatable and held the denial was unreasonable,

arbitrary, and capricious.  We disagree with the trial court and

will reverse.

     William S. Stickley is a physician who owns and resides on

a farm containing over two hundred acres in Rockingham County

zoned General Agricultural A-2.  In the county, commercial

poultry production is one of the primary industries.  The county

ranks among the top ten nationwide in turkey production.  Three

of the top ten taxpayers in the county are poultry producers

employing more than 8,500 people in 1999, not counting

individuals who are "poultry farmers."

     Poultry farmers are independent farmers who receive "young

chicks" from poultry companies and "house the birds by the tens

of thousands in poultry houses" until the birds are "grown out" and then retrieved by the companies for further processing.  The poultry farmers are responsible for the birds' feeding and health while in their possession.

Dr. Stickley is a poultry farmer for Rocco Enterprises, Inc., a commercial poultry company.  He has "one poultry house on a 15 acre parcel located in the middle of his land which is surrounded by the would be shooting preserve involved in this case."  Fifteen acres "is the requirement for a turkey house." Dr. Stickley can maintain as many as 35,000 turkeys in his poultry house at one time.

Also, "for the last few years," Dr. Stickley has been raising upland game birds in pens on his farm and releasing them for hunting during the regular season.  Rocco Enterprises has no objection to his raising game birds on his property at the same time he raises commercial turkeys.

Game birds can carry various diseases that can be transmitted to other species, including avian influenza, Newcastle disease, laryngotracheitis, equine encephalitis, salmonella pullorum, blackhead, and fowl cholera.  In a poultry producing area such as Rockingham County, the possibility of an epidemic in any of these diseases is the subject of great concern because of the potentially devastating effect upon the poultry industry in particular and the economy of the entire

area in general, with the possibility of a ban being imposed upon exports of poultry from the county.

Avian diseases can be transmitted to other forms of animal life in a number of ways. Avian flu is especially feared. It is spread through airborne transmission as well as nasal and fecal excretions, and its virus remains infectious for relatively long periods of time. Migratory waterfowl represent an especially serious threat to poultry in transmitting avian flu; waterfowl drop feces near farm ponds and the fecal matter may get on the boots of poultry workers who then enter poultry houses in their contaminated footwear.

In 1983-84, Rockingham County suffered an avian flu epidemic, resulting in the destruction of many flocks of poultry. Since that time, the poultry industry has instituted the practice of biosecurity, a system designed "to keep everything that could spread . . . disease out of the poultry house." Biosecurity includes "doing things as simple as changing clothes and boots before going into a poultry house or spraying all entrants before entering a confined feeding space." Biosecurity also includes utilizing "'all in, all out' flock control which means that prior to the birds going into the house, the poultry house is washed down, sterilized and disinfected and then all the birds are put in at one time and taken out at one time." In addition, the birds in poultry

houses are isolated, with only limited human entry into the houses permitted.

In his turkey operation, Dr. Stickley practices "all the biosecurity" recommended by Rocco Enterprises. In addition, he voluntarily installed a chlorinating system that is now a required feature. His yearly average of "liveability" in his turkey flocks is 97 percent, which is considered "extremely good." His turkeys have been infected from the environment only once, with blackhead, which "[m]ost likely . . . would come in from . . . worms through the floor or possibly even a rodent."

Dr. Stickley obtains his pen-reared game birds by purchasing "day-old chicks . . . a thousand chicks at a time" or by hatching eggs either purchased from out-of-state suppliers or derived from his own breeding stock. The eggs purchased out-of-state are certified to be "salmonella and typhoid free."

Some time prior to September 15, 1997, Dr. Stickley applied to the Virginia Department of Game and Inland Fisheries (the Department) for a permit to propagate and sell chukar, northern bobwhite quail, and ring-necked pheasant, and on that date the Department issued the permit. Among the permit's provisions was a statement that the permittee was not absolved "of any responsibilities or conditions of any other federal, state, or local laws and regulations."

The Department permits hunting on licensed shooting preserves in Virginia for a season that extends two months longer than the regular game bird hunting season.  On September 10, 1997, Dr. Stickley filed an application with the Department to operate a licensed shooting preserve on a designated 100-acre portion of his farm, stating he wished to hold and hunt pen-reared quail, chukar, and pheasant.  In response to a statement on the application that "I am in compliance with all zoning and land use requirements," Dr. Stickley did not check either the "yes" or "no" box but wrote the word "pending" outside the boxes.  The Department issued Dr. Stickley the permit he had requested to operate a licensed shooting preserve.

About the same time, Dr. Stickley inquired of the Rockingham County Zoning Administrator "what he would need to [do to] have . . . a shooting reserve, which would include the raising of game birds and releasing them for hunting."  A zoning inspector advised Dr. Stickley he would need a special use permit.  Accordingly, on September 10, 1997, Dr. Stickley filed a special use permit application for a private shooting preserve on a 100-acre portion of his farm.

The Board of Supervisors (the Board) conducted a public hearing on the application but tabled the request and decided to make a site visit.  On the visit, the Board apparently learned for the first time that Dr. Stickley raised turkeys on his farm

for a commercial poultry company.  After the visit, the Board directed the zoning administrator to contact the Poultry Foundation and representatives of the poultry industry "to get their feedback."  The zoning administrator made the contacts and submitted her report to the Board voicing the concerns of the Poultry Federation and several poultry companies about "[w]ild birds carry[ing] diseases into poultry flocks."  At its regular meeting on November 19, 1997, the Board unanimously denied Dr. Stickley's request for a special use permit.

Dr. Stickley then filed in the trial court a Petition for Review and an Amended Petition for Review.  In the amended petition, he prayed that the court issue a writ of certiorari to the Board commanding it to certify its record to the court and that the court declare the action of the Board null and void. The Board responded to the amended petition, and the court proceeded to hear extensive evidence ore tenus on the risk to the poultry industry in Rockingham County from diseases carried by wild birds.  Finding that "the action of the County Board of Supervisors was one that was not fairly debatable, and was thus unreasonable, arbitrary and capricious," the court overturned the Board's denial of Dr. Stickley's application for a special use permit.  We awarded the Board this appeal.

On appeal, Dr. Stickley devotes a portion of his argument to the proposition that the Board lacked the authority to use

6

its zoning ordinance "to prevent the transmission of infectious diseases to commercial flocks of turkeys and chickens raised in poultry houses."  However, Dr. Stickley raised this same issue in a pretrial motion for summary judgment, and the trial court denied the motion, ruling that "the Board of Supervisors clearly has authority to prohibit the raising of game birds from eggs so long as that authority is not otherwise pre-empted by enactments of the Legislature or utilized in a manner which otherwise violates the law."  Dr. Stickley has not assigned cross-error to this ruling.  Accordingly, it has become the law of the case, and we will not consider the issue further.  See Norfolk & Portsmouth Belt Line R.R. Co. v. Barker, 221 Va. 924, 928, 275 S.E.2d 613, 615 (1981).

Dr. Stickley also argues that, because the trial court heard the evidence ore tenus, "its factual findings carry the same weight as [a] jury's verdict."  However, this case involves legislative action by the Board.  See County Board of Arlington v. Bratic, 237 Va. 221, 226, 377 S.E.2d 368, 370 (1989).  In such a case, while we accord the trial court's finding the usual presumption of correctness, we also accord the legislative action a presumption of validity.  Fairfax County v. Jackson, 221 Va. 328, 334, 269 S.E.2d 381, 385 (1980).  " 'In other words, the presumption of validity of legislative action does not disappear when a trial court finds that the action is

7

unreasonable; the presumption accompanies the legislative action when the latter is brought to this court for review, and it is viable until this court holds with the trial court that the legislative action is unreasonable.' " Id. (quoting Loudoun County v. Lerner, 221 Va. 30, 35, 267 S.E.2d 100, 103 (1980)).

We said in Bratic that we have established the following test for determining whether the presumption of reasonableness of legislative action should stand or fall:

> If the presumptive reasonableness of zoning action is challenged by probative evidence of unreasonableness, the challenge must be met by evidence of reasonableness. If such evidence of reasonableness is sufficient to make the issue fairly debatable, the legislative action must be sustained; if not, the presumption is defeated by the evidence of unreasonableness and the legislative act cannot be sustained.

237 Va. at 227, 377 S.E.2d at 371.

However, "[t]he governing body is not required to go forward with evidence sufficient to persuade the fact-finder of reasonableness by a preponderance of the evidence [but] must only produce evidence sufficient to make the question 'fairly debatable.' " Ames v. Town of Painter, 239 Va. 343, 348, 389 S.E.2d 702, 704 (1990). And " '[a]n issue may be said to be fairly debatable when, measured by both quantitative and qualitative tests, the evidence offered in support of the opposing views would lead objective and reasonable persons to

8

reach different conclusions.' " Id. (quoting Bratic, 237 Va. at 227, 377 S.E.2d at 371).

Dr. Stickley argues that "the disease issue" in this case "is not fairly debatable." He says he presented four expert witnesses, all of whom confirmed "that there is no risk of transmission of diseases from game birds to commercial poultry given the biosecurity measures adopted by the commercial poultry industry." Dr. Stickley also says that all the experts, including the Board's expert, agreed "there is no documented incident where captive pen-raised game birds resulted in any kind of disease problem for commercial poultry."

In what turned out to be a battle of the experts, Dr. Stickley presented Robert W. Duncan, a certified wildlife biologist and director of the wildlife division of the Virginia Department of Game and Inland Fisheries; Ronald G. King and Gabriel Meza, veterinarians with the Virginia Department of Agriculture and Consumer Services, both stationed in Rockingham County; and Roger E. Olson, a veterinarian who is chief of the animal health program of the Maryland Department of Agriculture. The Board presented Elizabeth A. Krushinskie, a "[c]orporate veterinarian" for Wampler Foods, a commercial poultry company in Rockingham County.

Mr. Duncan testified that, in his twenty-two years with the Department of Game and Inland Fisheries, he was not aware of any

9

documented harmful effect to poultry operations from the raising and releasing of game birds or the operation of shooting preserves. Mr. Duncan tempered his testimony somewhat with the statement that "there's neither a realistic nor a documented case where captive-reared game birds have caused the disease outbreak in domestic poultry given where those are separated by the confinement and biosecurity that's presently employed." And, while Mr. Duncan was "not sure if it is possible" for game birds to carry avian flu, he conceded "there are a variety of other diseases which would affect commercial poultry that game birds do carry and are natural hosts for."

Dr. King testified concerning an outbreak of avian flu occurring in two turkey houses on a farm in northern Rockingham County some thirteen months prior to the trial below, resulting in a decision to "depopulate . . . the entire farm" by slaughtering 58,000 turkeys and causing the farmer to "suffer financially." The farm was placed under quarantine, the turkeys were loaded on covered trucks whose wheels and undercarriages were disinfected, and the trucks followed a predetermined route so they would pass "the least number of poultry farms" to and from the slaughter facility.

Dr. King attributed the outbreak to "migrating waterfowl that utilized a farm pond" and "either the farmer or some of the workers probably walked in loose manure from the feces from the

migrating waterfowl . . . and carried it into the poultry house and, from there, from one poultry house to the other."  Dr. King emphasized the importance of biosecurity but admitted there are "breaches in biosecurity . . . because someone got in a hurry and just wasn't thinking."  And, contrary to Dr. Stickley's assertion that all the experts agreed "there is no documented incident where captive pen-raised game birds resulted in any kind of disease problem for commercial poultry," Dr. King voiced no such agreement.  Furthermore, he conceded that game birds "can transmit avian flu" to poultry, and he said it was possible the recent outbreak of that disease on the farm in northern Rockingham County originated with game birds.

Dr. Meza testified he had never found an instance in Rockingham County where avian flu was transmitted from game birds to poultry.  He opined that biosecurity "is the only way to prevent" the spread of disease into poultry flocks and that "if we don't get lax in the biosecurity . . . we will never have what happened in 83, 84," when Rockingham County suffered an avian flu epidemic.  He also said that "[w]ith good biosecurity," meaning to have poultry flocks in "isolation," he did not consider it a "big risk" to have pheasants, quail, and chukar "walking around outside the poultry house."  He acknowledged, however, that "it's almost impossible to make it completely safe" but that "you can minimize . . . [t]he risk."

11

He also conceded that game birds were the "natural hosts" of pullorum and other avian diseases.

Dr. Olson testified concerning an instance on the Eastern Shore of Maryland in 1993, when avian flu was found in a pheasant that was part of a confined flock of 30,000 game birds. It was Dr. Olson's opinion that the virus did not originate in the confined flock but likely was transmitted from ducks that got out and returned to the flock after commingling with wild waterfowl. Although the confined flock was subjected to "total depopulation," Dr. Olson said "it is now generally accepted that the risk to commercial poultry flocks was negligible."

However, contrary to Dr. Stickley's assertion that all his experts confirmed "there is no risk of transmission of diseases from game birds to commercial poultry given the biosecurity measures adopted by the . . . industry," Dr. Olson testified it was not his position, and he would never say, that "there is absolutely no risk of transmission of avian flu from game birds to poultry." There is "a big difference," he said, "between negligible and absolutely no risk." And he conceded there are "several significant" diseases in addition to avian flu "that can be spread from game birds to poultry and vice versa."

At this juncture, we note several troubling points in Dr. Stickley's evidence. Dr. Stickley's turkey house is "surrounded by the would be shooting preserve involved in this case." Dr.

Stickley raises game birds in large quantities and releases them on the shooting preserve that surrounds his turkey house. Dr. Stickley's expert witnesses concede game birds serve as "natural hosts" or "carriers" in the transmission of avian diseases to poultry.[1] Protection against the risk of the spread of avian diseases to poultry is dependent upon the effectiveness of biosecurity. The effectiveness of biosecurity is subject to the ever-present risk of human error. Human error of substantial proportions occurred in the avian flu outbreak in Rockingham County just thirteen months prior to the trial of this case below. Given all this, there is reason to doubt the sufficiency of Dr. Stickley's evidence to challenge the presumptive reasonableness of the Board's decision to deny him a special use permit.

However, we will give Dr. Stickley the benefit of the doubt and say his evidence is sufficient to challenge the presumptive reasonableness of the Board's decision. The question then becomes whether the Board has met the challenge with evidence of reasonableness sufficient to make the issue fairly debatable. See Bratic, 237 Va. at 227, 377 S.E.2d at 371.

As noted supra, the Board presented as its expert witness Dr. Elizabeth Krushinskie, a veterinarian with a commercial

---

[1] Being a "host" to a disease means being "home to a virus, a parasite, a bacterium."

13

poultry company.  She earned her Ph.D. in "Veterinary Microbiology, Avian Influenza," and her expertise is in commercial poultry.[2]  Her employment includes managing bird health, disease prevention, biosecurity, and investigation of disease outbreaks.  She testified concerning the diseases that affected poultry in Rockingham County.  While she acknowledged she had not had "personal experience with any game birds infecting poultry," she opined that diseases could be transmitted from game birds to poultry.  With specific reference to avian flu, Dr. Krushinskie testified that, while waterfowl constitute a "major source of Avian Flu," "game birds are a carrier" and "a host of influenza."

Dr. Krushinskie stated that biosecurity in the commercial poultry industry is "relatively good" but not "100 percent" perfect.  She told of a poultry farm that had tested positive for avian flu twice in the past five years when there had been no "direct entrance of waterfowl into the turkey operation or turkeys into the ponds adjacent to it," but, "somehow, that

---

[2] Dr. Stickley states on brief that "Dr. Krushinskie admitted that she is not an expert in the area of game birds," that "[s]he did not know anything about what types of other birds have been raised in [Rockingham] County," that "[s]he had not familiarized herself with any reports of diseases of game and wildlife in Virginia," and that "[s]he was not even familiar with the Southeastern Game and Wildlife Diagnostic Center in Athens, Georgia."

virus [was] able to penetrate, gain access to that turkey

operation."  And, she said, "[w]e don't know how."

Finally, Dr. Krushinskie was asked the following questions

and gave the following answers in the course of her testimony:

> Q  Dr. Krushinskie, if you were told of an instance of game birds being found outside of a poultry house, would you consider that a risk of disease transmission?
>
> A  Yes.
>
> . . . .
>
> Q  In your expert opinion, is it . . . a realistic threat of contamination or spreading of disease between game birds which are released for sport, for shooting, and commercial poultry?
>
> A  In my opinion, the concentrated rearing of game birds and their subsequent release into the environment adjacent to poultry, commercial poultry operations is a significant risk to the poultry industry in this area.
>
> Q  And if there is a spread of disease from those two flocks, it's capable of spreading to other flocks and through –
>
> A  Yes.  And the reason I say that is because if you have an occasional pheasant in the wild, naturally, they're a dispersed population with relatively few individuals per square mile.  But when you go to high density confinement rearing, whether it's poultry or game birds, you compound the stress, the disease exposure and the possibility for replication of diseases.  And that's why we see more disease in commercial operations than you would in a few chickens in your backyard.  It's because of the high density, the number of individuals you have, the kind of production pressure they're under in a small environment being artificially reared.
>
> If you do that with game birds, you increase their risk of developing disease themselves.  Then when you release them into the environment, you create a risk for other poultry or other birds in the area.  I think that's a

15

significant difference from just a natural pheasant running through the area.  [Emphasis added.]

The question in this case is not who presented the greatest number of expert witnesses or even who won the battle of the experts.  Rather, the question is whether there is any evidence in the record sufficiently probative to make a fairly debatable issue of the Board's decision to deny Dr. Stickley a special use permit.  In our opinion, Dr. Krushinskie's common-sense appraisal of the "significant risk" to poultry from the release of pen-raised game birds is amply sufficient to make that issue fairly debatable.  The Board did not act arbitrarily, therefore, in denying Dr. Stickley a special use permit.[3]  Accordingly, we will reverse the judgment of the trial court and enter final judgment here in favor of the Board.

Reversed and final judgment.

---

[3] Having reached this conclusion, we need not consider any other questions raised by the Board.