PRESENT: Hassell, C.J., Lacy, Koontz, Kinser, Lemons, and Agee, JJ., and Russell, S.J.

TODAY HOMES, INC., t/a CHESAPEAKE HOMES

OPINION BY
v. Record No. 052537          JUSTICE G. STEVEN AGEE
September 15, 2006

EMMA WILLIAMS, ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
H. Thomas Padrick, Jr., Judge

Today Homes, Inc., t/a Chesapeake Homes ("Chesapeake"), appeals the judgment of the Circuit Court of the City of Virginia Beach dismissing its amended bill of complaint against Emma Williams, George R. Woodhouse, and Majestic Homes, Inc. For the reasons set forth below, we will affirm the judgment of the trial court in part, reverse the judgment in part, and remand for further proceedings.

I. FACTS AND MATERIAL PROCEEDINGS BELOW

Chesapeake is a property developer and builder of single-family homes. Like other companies in the home building industry, Chesapeake "needed land . . . to build houses on." Williams served as Chesapeake's vice president of operations from June 2001 until March 13, 2003, and Woodhouse was Chesapeake's vice president of production during the same period. Williams and Woodhouse had a close working relationship and referred to themselves as "a team."

In the course of her employment, Williams was "responsible for all purchasing activities and customer service," but not the

1

acquisition of land.  Woodhouse supervised the actual construction work of the homes Chesapeake built.  Neither person's job description involved finding or purchasing lots for building.[1]

At the beginning of 2003, Frank Grossman, a realtor with Long & Foster Realtors, told Woodhouse about certain property he had listed for sale in Hampton ("the Sinclair Property").  Woodhouse mentioned the Sinclair Property to Williams and showed her a site plan.  At that time, the development plan for the Sinclair Property included a "55 and older active adult communit[y]."  Woodhouse testified that he did not believe Chesapeake would be interested in the property because Chesapeake "didn't do any 55 and older active adult communities."  Williams also believed Chesapeake would not be interested in purchasing the property.  Williams and Woodhouse had no further discussions about the property until after Chesapeake terminated Williams' employment on March 13, 2003.[2]

Williams testified without contradiction that prior to her termination, she had no intention of leaving Chesapeake and

_____

[1] Woodhouse had, however, in the past, identified possible building sites and brought them to Chesapeake's attention.  He testified that John Barnes, Chesapeake's president told him that seeking out properties to buy "was not [his] job, that [he] had enough on [his] plate with production and construction."  The trial court found this testimony "not believable . . . [but not] important in the scheme of things."

starting her own housing development company, and she had not identified any building sites for purchase. A few days after the termination of her employment by Chesapeake, Scott M. Gandy, a vendor in the building supplies industry, offered Williams financial backing if she started her own housing development company.

Woodhouse prepared a letter resigning from his employment with Chesapeake the day Williams was terminated, but did not submit the letter until April 24, 2003, when he gave his two week's notice. During the month of April, Woodhouse was in salary negotiations with Art Sandler, Chesapeake's owner. On May 9, at the conclusion of the two weeks, John M. Barnes, president of Chesapeake, asked Woodhouse to continue his employment with Chesapeake through at least May 20 because Woodhouse held the company's only North Carolina contractor's license, and Chesapeake's subcontractors were dependent on the license. Barnes and Woodhouse agreed that Chesapeake would pay Woodhouse "for four weeks until someone got their license." That day, Barnes and Woodhouse signed a memorandum, which was sent to Chesapeake's vendors stating that Woodhouse was working on Chesapeake's "North Carolina expansion into the Raleigh and Charlotte markets." Woodhouse did no further work for

---

[2] The termination of Williams' employment by Chesapeake is not at issue in this appeal.

Chesapeake after May 9, but continued to receive his salary from Chesapeake until the first of June, by which time Barnes had obtained a North Carolina contractor's license.

After Williams' termination, but while Woodhouse remained employed by Chesapeake, the two discussed going into business together and caused Majestic to be incorporated on March 27, 2003. Williams and Woodhouse were listed as president and secretary, respectively, of Majestic. Woodhouse began working for Majestic on May 15, 2003, and drew his first paycheck on June 1, 2003.

After forming Majestic, Williams searched for properties to purchase by contacting real estate companies, including Long & Foster. Near the end of March 2003, Woodhouse put Grossman in contact with Williams, and discussed the Sinclair Property with her. When Grossman showed Williams the Sinclair Property, she recognized it as "the same property that [she] had heard about from [Woodhouse]" earlier in the year when she was working for Chesapeake. Grossman also suggested to Dave Jester, president of Marlyn Development Corporation, which owned the Sinclair Property, that Jester contact Williams as a potential builder and that Williams had a potential partner in Woodhouse. Jester testified that he was willing to deal with Majestic even though

4

it was a new company because of his personal relationship with Scott Gandy.[3]

On April 15, 2003, Majestic entered into a contract with Marlyn to purchase 27 lots on the Sinclair Property.[4] Williams, but not Woodhouse, was a signatory to the agreement on behalf of Majestic. In 2004, Majestic had gross profit from the sale of homes on the Sinclair Property of $4,469,585.00. There is no dispute that neither Williams nor Woodhouse ever disclosed the Sinclair Property to Chesapeake or received Chesapeake's consent to acquire it.

Chesapeake filed a three count amended bill of complaint alleging Williams and Woodhouse, as corporate officers of Chesapeake, breached their common law and contractual fiduciary duty to Chesapeake when they failed to disclose the existence of the Sinclair Property to Chesapeake and later purchased it themselves through Majestic. Chesapeake also alleged that after

---

[3] Jester also testified that Chesapeake was "not in the galaxy of consideration" for the contract on the Sinclair Property. He believed that Chesapeake was "not the [right] sized company" and the Sinclair Property development was not in "the nature of their type of work." In evaluating this evidence the trial court found that

> whether Mr. Jester would have done business with Chesapeake Homes or not, is really irrelevant, it comes down to the opportunity and whether or not it was a real opportunity, one that presented itself. So it's a real narrow issue . . . .

[4] This contract was subsequently voided and a new contract executed whereby Marlyn agreed to make Majestic the sole builder

Williams' termination, she "aided and assisted Woodhouse in breaching the fiduciary duties he owed to Chesapeake while still employed by it."  In a separate count, Chesapeake further alleged that Williams and Woodhouse conspired to breach their fiduciary duties to Chesapeake.  Among other remedies, Chesapeake sought the imposition of a constructive trust on the Sinclair Property owned by Majestic and $5 million in damages to be trebled in accordance with Code § 18.2-499, et seq.

After a one-day bench trial, the trial court dismissed Chesapeake's amended bill of complaint and entered a final decree on September 27, 2005, stating that Chesapeake "failed to meet its burden of proof as to all counts contained in the Amended Bill of Complaint."  The trial court found the Sinclair Property was "important to [Chesapeake]," and "that [Chesapeake was] seeking other business opportunities."  However, the trial court determined that Chesapeake had not proven that Williams and Woodhouse breached their fiduciary duty to Chesapeake. Specifically, the trial court ruled Chesapeake had presented "no evidence that [Williams] had any . . . relevant enough information to go forward with any actions that would in any way harm [Chesapeake]," nor had Chesapeake proven that Woodhouse did

for all 77 lots in the development project.  Woodhouse was a signatory on the second contract.

anything "that could be construed as a breach of fiduciary duty."  We granted Chesapeake this appeal.

Chesapeake makes ten assignments of error which can be condensed to the following four issues: (1) the trial court erred in finding that Williams and Woodhouse (collectively "the Defendants") did not breach a fiduciary duty to Chesapeake when they failed to disclose the existence of the Sinclair Property to Chesapeake while one or both was still employed by Chesapeake, and later purchased the property through Majestic; (2) the trial court erred in not finding that Williams, after her termination, "aided and assisted" Woodhouse so she "could usurp the opportunity with Woodhouse while Woodhouse was still employed by Chesapeake;"[5] (3) the trial court misallocated the burden of proof by placing upon Chesapeake the burden of showing the breach of fiduciary duty rather than requiring the Defendants to show that they did not breach their fiduciary obligations; and (4) the trial court erred in overruling Chesapeake's objection to questions posed to the Defendants about their opinions as to whether the Sinclair Property was something that should have been disclosed to Chesapeake or in which Chesapeake would have been interested.

II. ANALYSIS

Chesapeake argues that it met its burden to prove that the Sinclair Property was a corporate opportunity for Chesapeake and that the Defendants, as corporate officers, were fiduciaries of Chesapeake and took the corporate opportunity for their own benefit without disclosure to Chesapeake or its consent. Chesapeake contends the burden of proof then shifted to the Defendants to prove they did not breach their fiduciary duty to Chesapeake. In that regard, Chesapeake avers the trial court erred in placing the burden of proof for breach of fiduciary duty upon it, instead of the Defendants. When the burden of proof is properly allocated, Chesapeake says the record clearly reflects the Defendants did not meet their burden and the resulting breach of fiduciary duty makes them liable to Chesapeake.

The Defendants argue that Chesapeake's threshold burden was not met because the trial court did not find the Sinclair Property to be a corporate opportunity for Chesapeake. Even if the trial court did reach that conclusion, the Defendants then contend a proper legal analysis based upon Solimine v. Hollander, 16 A.2d 203, 214-15 (N.J. Ch. 1940) and Guth v. Loft, Inc., 5 A.2d 503, 510-11 (Del. 1939), shows the Sinclair Property was not a corporate opportunity of Chesapeake under the

---

[5] Chesapeake did not assign error to the dismissal of the count alleging conspiracy so that issue is not before us on

facts of this case.  In any event, the Defendants argue they learned of the Sinclair Property in their individual capacities, and not in their role as officers of Chesapeake.  Thus, they argue there was no duty of disclosure on their part and no corresponding breach of fiduciary duty.

## A. CHESAPEAKE'S PRIMA FACIE CASE

We first address the question of whether the Sinclair Property was a corporate opportunity for Chesapeake, because if there was no corporate opportunity, then there was no fiduciary duty to breach in that regard.  Contrary to the Defendants' assertion on appeal, the trial court did conclude that the Sinclair Property was a corporate opportunity for Chesapeake: "[I]t's clear to the Court that these lots, any lots, were important to [Chesapeake], that they were, in fact, seeking other business opportunities."  No reasonable reading of the trial court's determination could lead to a conclusion other than that it found the Sinclair Property to be a corporate opportunity for Chesapeake.

The Defendants contend, nonetheless, that there could be no corporate opportunity under the facts of this case.  However, the Defendants did not assign cross-error to the trial court's finding that the Sinclair Property was a corporate opportunity for Chesapeake.  Thus, they cannot now raise that argument on

appeal.

appeal.  Rule 5:18(b); Monahan v. Obici Med. Mgmt. Servs., 271 Va. 621, 637, 628 S.E.2d 330, 339-40 (2006); see also Advanced Marine Enters. v. PRC, Inc., 256 Va. 106, 126, 501 S.E.2d 148, 160 (1998).  The unchallenged finding of the trial court is now the law of the case and binding on the parties for purposes of appeal.  Board of Supervisors v. Stickley, 263 Va. 1, 6, 556 S.E.2d 748, 751 (2002).

The trial court specifically found Williams to be "an officer of [Chesapeake]."  While the trial court did not use the same words regarding Woodhouse, it found he "was the vice president involving production" of Chesapeake, a fact Woodhouse admitted in his Answer.  The Defendants do not contest on appeal that they were officers of Chesapeake, and in that capacity, had a fiduciary relationship to Chesapeake.  Trayer v. Bristol Parking, Inc., 198 Va. 595, 604, 95 S.E.2d 224, 230 (1956) (citation omitted).

Neither is there any dispute that Woodhouse or Williams did not disclose the Sinclair Property to Chesapeake or seek Chesapeake's consent to take the Sinclair Property. Accordingly, Chesapeake did prove its prima facie case as to the Defendants in that the Sinclair Property was a corporate opportunity for Chesapeake, which Williams and Woodhouse, as corporate officers of Chesapeake, did not disclose to Chesapeake or seek Chesapeake's consent to take for their direct benefit.

10

## B. BREACH OF FIDUCIARY DUTY

Our inquiry now turns to what duty, if any, the Defendants owed Chesapeake regarding the Sinclair Property.  It is a fundamental principle that a corporate officer or director is under a fiduciary obligation not to divert a corporate business opportunity for personal gain because the opportunity is considered the property of the corporation.  See Feddeman & Co. v. Langan Assocs., P.C., 260 Va. 35, 46 n.1, 530 S.E.2d 668, 675 n.1 (2000).  Underlying this concept is the expectation that officers, as corporate fiduciaries, exercise the "utmost good faith" and loyalty in their dealings with, and on behalf of, the corporation.  Feddeman & Co., 260 Va. at 43, 530 S.E.2d at 673. "[T]his good faith forbids [a corporate officer from] placing himself in a position where his individual interest clashes with his duty to his corporation."  Rowland v. Kable, 174 Va. 343, 366, 6 S.E.2d 633, 642 (1940).  As long as an individual remains a corporate officer, he "owes an undivided duty to [the corporation], and cannot place himself in any other position which would subject him to conflicting duties, or expose him to the temptation of acting contrary to [its] best interests."  Id. at 367, 6 S.E.2d at 642 (citation omitted).

The "unbending rule" that a fiduciary "entrusted with the business of another cannot be allowed to make that business an object of interest to himself," is abrogated if the fiduciary

11

obtains the "consent of the [corporation]" after "full disclosure." Id. at 366-68, 6 S.E.2d at 642-43. As this Court has observed, "[t]he motive of self-interest is so natural and the danger of temptation to secure private advantage so great," that "good faith alone is not sufficient in the absence of full disclosure and consent of the interested parties . . . to make an exception to the general rule that a [corporate fiduciary] cannot enter into any relation or do any act inconsistent with the interest of the [corporation]." Id. at 369-70, 6 S.E.2d at 643-44.

A "director of a corporation is held chargeable with knowledge of such corporate affairs as it is his duty to know and which he might have known had he diligently discharged his duties." In re Adams Laboratories, Inc., 3 B.R. 495, 499 (Bankr. E.D. Va. 1980). There is no distinguishable difference between a corporate officer and a director in this regard as it relates to their fiduciary duty. His "belief," whether in good faith or bad, cannot negate the clear fiduciary duty to disclose a corporate opportunity before taking it for himself. Rowland, 174 Va. at 369-70, 6 S.E.2d at 643-44. Consequently, it makes no difference whether the corporate opportunity came to the corporate fiduciary in the fiduciary's capacity as a corporate officer or in some "individual" capacity.

12

The Defendants argue that this requirement of "full disclosure" is an unworkable burden on a corporation's officers because it "require[s] corporate officers to disclose all business opportunities of which they learn . . . regardless of whether the corporate officer is planning to take advantage of the opportunity personally." This view misconstrues the requirements of disclosure, which become operative and relevant only when an officer receiving information about a potential corporate opportunity then appropriates that opportunity for his own use. See Upton v. Southern Produce Co., 147 Va. 937, 948-49, 133 S.E. 576, 580 (1926) (Directors breached their fiduciary duty to a struggling corporation when they secretly purchased corporation stock on credit and sold it at a profit to an outside company without first disclosing the opportunity to the corporation and other stockholders.). See also Demoulas v. Demoulas Super Mkts., 677 N.E.2d 159, 181 (Mass. 1997) ("[T]o satisfy the duty of loyalty, a fiduciary wishing to engage in a self-dealing transaction must disclose details of the transaction and the conflict of interest to the corporate decisionmakers."). Thus, an officer's desire to take an opportunity as his own, puts him on notice of his fiduciary duty to disclose the opportunity to the corporation before acting upon it for his personal benefit.

The trial court found that "[t]he information [Woodhouse] received [regarding the Sinclair Property] did not become important until . . . March 13," the day Williams' employment with Chesapeake was terminated and Woodhouse first alerted Barnes of his intention to resign. That factual finding by the trial court was not the subject of an assignment of error or cross error and is now the law of the case. Stickley, 263 Va. at 6, 556 S.E.2d at 751. The Defendants' casual knowledge of the Sinclair Property's existence in early 2003 is not, by itself, a basis for requiring disclosure or attaching liability for any of their later actions.

We must initially address, however, Chesapeake's contention that the trial court "misallocated the burden of proof, putting on Chesapeake Homes the burden of showing breach of fiduciary duty rather than requiring Williams and Woodhouse to show that they did not breach their fiduciary obligations." We agree with Chesapeake that the trial court erred in this regard.

Once a plaintiff has shown that a corporate opportunity existed and the corporate fiduciary appropriated it without disclosure and the consent of the corporation, a prima facie case has been shown. Under our jurisprudence, the burden shifts to the defendant fiduciary to show why the taking of the corporate opportunity was not a breach of his fiduciary duty. "[W]hen transactions have occurred between fiduciaries and [the

14

corporation], the burden of proof lies upon the [fiduciary] to show that the transaction has been fair." Giannotti v. Hamway, 239 Va. 14, 24, 387 S.E.2d 725, 731 (1990). "The burden of proof lies, in all cases, upon the party who fills the position of active confidence to show the transaction has been fair." Waddy v. Grimes, 154 Va. 615, 648, 153 S.E. 807, 817 (1930).

The trial court's finding that neither Williams nor Woodhouse breached a fiduciary duty to Chesapeake was thus based on the wrong rule of law as it incorrectly placed the burden of proof on Chesapeake. Accordingly, we will reverse the trial court's judgment and remand the case to the trial court for a determination of whether there was a breach of fiduciary duty upon proper application of the burden of proof. See, e.g., Gibbs v. Gibbs, 239 Va. 197, 201-02, 387 S.E.2d 499, 501-02 (1990) (reversing the judgment of the trial court because the trial court placed the burden of proof on the wrong party, and remanding the case for further proceedings applying the proper burden of proof); McEntire v. Redfearn, 217 Va. 313, 316-17, 227 S.E.2d 741, 744 (1976) (same). However, we will reverse and remand only with respect to Woodhouse because the record is uncontradicted as to Williams regardless of the burden of proof. Even though the trial court erred in allocating to Chesapeake the burden of showing Williams' breach of fiduciary duty, it is clear on this record there could be no breach by Williams.

Chesapeake argues that Williams' fiduciary duty to Chesapeake continued following her termination on March 13 and that her purchase of the Sinclair Property was in violation of that duty. Chesapeake cites a number of foreign cases in support of this argument, but all are distinguishable from the facts of this case, in part, because of the trial court's binding factual finding that only events after Williams' termination on March 13th are relevant.

It is true that "[r]esignation or termination does not automatically free a director or employee from his or her fiduciary obligations." T.A. Pelsue Co. v. Grand Enterprises, Inc., 782 F. Supp. 1476, 1485 (D. Colo. 1991). Liability post-termination continues only for those "transactions completed after termination of the officer's association with the corporation, but which began during the existence of the relationship or that were founded on information gained during the relationship." In re H. King & Assocs., 295 B.R. 246, 274 (Bankr. N.D. Ill. 2003). See also Thompson v. Central Ohio Cellular, Inc., 639 N.E.2d 462, 470 (Ohio Ct. App. 1994). "Whether specific conduct taken prior to resignation breaches a fiduciary duty requires a case by case analysis." Feddeman, 260 Va. at 42, 530 S.E.2d at 672.

The record for purposes of appeal establishes that Williams' purchase of the Sinclair Property through Majestic was

16

not "founded on information gained during" her employment with Chesapeake. Prior to her termination, Williams had no intention of leaving Chesapeake and starting her own development company. There is no evidence in the record that she used any of Chesapeake's resources to establish Majestic or regarding the Sinclair Property. Williams' casual knowledge of the Sinclair Property before her termination triggered no duty to disclose because her relationship with the Sinclair Property as a corporate opportunity occurred only after March 13th. After March 13th, Williams was under no fiduciary duty to Chesapeake because she was no longer an officer.[6]

There was thus no basis for liability on Williams' part after March 13 for breach of a fiduciary duty to Chesapeake as she had no duty. Thus, even though it applied the wrong burden of proof, the trial court did not err in dismissing the amended bill of complaint as to Williams. See Hilb, Rogal & Hamilton Co., 247 Va. at 249, 440 S.E.2d at 923.

## C. OTHER CLAIMS

The trial court did not directly address Chesapeake's claim that Williams was liable on the alternative ground that she "aided and assisted Woodhouse in breaching the fiduciary duties he owed to Chesapeake while still employed by it." Chesapeake

---

[6] In contrast to Williams, Woodhouse did continue as an officer of Chesapeake for at least two months after March 13th

17

assigned error to the trial court's failure to find Williams liable on this basis, but Chesapeake's entire argument on appeal consists of the following statement on brief: "[S]he [Williams] would be liable for aiding and assisting Woodhouse in the breach of his fiduciary duties while he was still employed by Chesapeake Homes." Because Chesapeake has not adequately briefed or argued this assignment of error, we will not consider this assignment of error. Rule 5:17(c); Rule 5:27; Muhammad v. Commonwealth, 269 Va. 451, 478, 619 S.E.2d 16, 31 (2005); Sheppard v. Commonwealth, 250 Va. 379, 386, 464 S.E.2d 131, 135 (1995).

Finally, Chesapeake has claimed error in the trial court's failure to find liability to Chesapeake on behalf of Majestic. However, Chesapeake has neither pled nor alleged facts upon which Majestic would be liable to it. Accordingly, the trial court did not err in finding for Majestic.

### III. CONCLUSION

For the foregoing reasons we will reverse the trial court's judgment dismissing the amended bill of complaint as to Woodhouse and affirm the trial court's judgment as to Williams and Majestic. We will remand the case to the trial court for further proceedings to determine whether Woodhouse breached a

and took certain actions in regard to the Sinclair Property.

18

fiduciary duty to Chesapeake, in conformance with the principles

expressed in this opinion.[7]

<u>Affirmed in part,</u>
<u>reversed in part,</u>
<u>and remanded.</u>

---

[7] In view of our resolution of the issues on appeal, we do not address Chesapeake's assignments of error regarding overruling its objections to certain questions propounded to the Defendants.