PRESENT:  Koontz, Kinser, Lemons, Millette, and Mims, JJ.,
Carrico and Russell, S.JJ.

TOWN OF LEESBURG

                                        OPINION BY
  v.   Record Nos. 091455    JUSTICE LEROY F. MILLETTE, JR.
              & 092329            November 4, 2010

STEVE GIORDANO, JR., ET AL.

              FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
                        Thomas D. Horne, Judge

     In this appeal, we consider whether the circuit court

erred in ruling that the Town of Leesburg failed to present

sufficient evidence to meet its burden under the fairly

debatable standard in a challenge to a town ordinance that

imposes a 100% surcharge on water and sewer consumption rates

charged to residents of Loudoun County who reside outside of

the Town of Leesburg.[1]

                            BACKGROUND

     Seven individuals and three homeowner's associations (the

complainants) filed this civil action against the Town of

Leesburg (the Town), challenging a town ordinance that

increased the water and sewer rates affecting properties owned

by the complainants that were located in Loudoun County, but

outside the Town.  By a series of agreements with Loudoun

County, the Town was given the exclusive right to provide water

_____

     [1] We previously considered this case and issued an opinion
in Town of Leesburg v. Giordano, 276 Va. 318, 667 S.E.2d 552

and sewer services to properties located in a certain area of Loudoun County, but outside the Town. The water and sewer utilities are owned and operated by the Town. In contrast to the circumstances prevailing in many other states, the out-of-town municipal utility rates, which are at issue in this case, are not regulated by the state regulatory authority. By a 1998 ordinance, the Town increased the water and sewer consumption rates by imposing a 50% surcharge on out-of-town customers. By an ordinance adopted in 2005, effective January of 2006, the Town Council again increased the rates by imposing a 100% surcharge on water and sewer consumption rates charged to out-of-town customers.[2] The water and sewer services provided to in-town and out-of-town customers were the same.

Prior to enacting the 100% surcharge, the Town hired Municipal & Financial Services Group (MFSG) to conduct a study regarding the pricing of utility services. This was done pursuant to the Town's policy to conduct a cost of service study for water and sewer rates every five years to assure the stability and financial health of the water and sewer utility

_____

(2008). The issues we considered in that case are not relevant to those presented in this appeal.

[2] It is important to note that these surcharges are imposed on the consumption rates charged for water and sewer services, which is only one charge, among others, imposed upon customers for water and sewer services. Therefore, a 100% surcharge on consumption rates does not increase an out-of-town customer's bill for water and sewer services by 100%.

fund.  MFSG issued two reports as a result of its study.  In its initial October 2005 report, MFSG concluded that the Town's existing user rates for water and sewer did not produce sufficient revenue to cover the revenue requirements for fiscal year 2006 and beyond.  MFSG recommended that the Town establish an "O&M Reserve" and a "Repair, Replacement, and Rehabilitation ('3R') [R]eserve" for both the water and sewer systems.  These reserves would provide funds necessary for "unplanned repairs or other significant cash outlays," and "unexpected major repairs and planned replacement or rehabilitation of equipment or other major fixed assets."  To establish these recommended reserves and raise sufficient revenue to cover cost, MFSG recommended that the Town increase water and sewer rates incrementally over the next five years.

In its November 2005 final report, MFSG recommended that the Town adopt a 100% surcharge on water and sewer consumption rates charged to out-of-town customers as a means to collect sufficient revenue to establish reserves and cover costs.  However, MFSG stated in its final report:  "It should be noted that the surcharge in-Town vs. outside-Town is proposed to increase from 50% to 100% based upon policy guidance provided by the Town Council."  In addition to the 100% surcharge on out-of-town customers, MFSG recommended that the Town increase the water and sewer rates incrementally, similar to its initial

recommendation, but in smaller increments, for fiscal years 2006 through 2010. In its final report, MFSG concluded that the proposed rate increases, including the 100% surcharge, were necessary to increase revenue to meet costs and establish the two reserve funds. MFSG's study was conducted using a "cash basis" method to determine the revenue that the Town needed to cover the cost of service, meet revenue requirements, and establish the recommended reserves. MFSG also used this method to design a rate structure consistent with the Town's goals and objectives.

The complainants filed a complaint against the Town seeking a declaratory judgment that the water rates charged to out-of-town customers were "unfair and unreasonable," in violation of Code § 15.2-2143, and that the sewer rates charged to out-of-town customers were "impracticable, inequitable, and non-uniform," in violation of Code § 15.2-2119. The complainants also sought injunctive relief directing an adjustment of rates for water and sewer service provided to out-of-town customers, and a monetary judgment for money paid to the Town that was in excess of a reasonable and fair rate for water and sewer service.

At trial, Glenn A. Watkins, an economist specializing in public utilities rate-making, testified as the complainants' expert witness. Watkins stated that his work has focused on

4

regulated utilities rather than unregulated utilities. Although Watkins had testified before the State Corporation Commission regarding regulated utilities, he had not previously testified before a Virginia court in a case involving municipal water and sewer rates.

Watkins testified that the rates charged to out-of-town customers were excessive. In formulating his opinion as to the reasonableness of the out-of-town rates, Watkins conducted a rate study. Watkins testified that the purpose of the rate study is two-fold: first, to determine if the rates at issue are fair and reasonable; and if not, second, to determine the extent to which the rates are excessive. Watkins further testified that a rate study is a three tier process, consisting of the following steps: (1) determining the revenue that is needed to operate the utility; (2) allocating the costs among the various groups of customers the utility serves, after determining if there is any reason to allocate costs differently to one group of customers than to another group; and (3) establishing the "rate design," which is the development of the actual rates charged. In performing the rate study, Watkins sought to estimate the "maximum rate that could be deemed fair and reasonable."

Watkins used the "utility" method in conducting his rate study. By using the "utility" method, Watkins considered

issues such as "cost of capital, availability fee contributions, absence of quality issues, transfers from the utility fund to the general fund, system capacity, depreciation, owner's risk, operations and maintenance costs, fair return on investment, and a reasonable profit." Watkins testified that the "utility" method is the "most applicable pricing standard for determining out-of-town rates." However, he also pointed to authority that acknowledges that "revenue requirement studies using the cash needs approach are simpler than studies using the utility approach."

Watkins was questioned concerning the Town's policy decision to impose a 100% surcharge on consumption rates charged to out-of-town customers, particularly the relevance of the differential in rates charged by other localities. When asked by the complainants' counsel if there are other ways of establishing reasonable rates not based on cost, Watkins responded, "Unequivocally no." In a competitive world, Watkins said, "costs are the standards for prices." Because the Town is operating as a monopoly, however, Watkins testified that the rates must reflect costs to "act as a surrogate for competition." Watkins also testified that from an operational standpoint there is "essentially no difference" in cost to serve out-of-town customers versus in-town customers.

Based on his preliminary analysis, Watkins testified that the water and sewer rates for out-of-town customers that became effective on January 1, 2006 were excessive. Watkins did not examine the fairness or unfairness of in-town rates because, in his opinion, the fact that there is a differential between in-town and out-of-town rates is irrelevant. Watkins testified that the rate differential was not of grave concern, but what he found excessive was the absolute level of the rate charged to out-of-town customers. According to Watkins, as customers of a monopoly service, the most the out-of-town customers should pay is the cost base rate.

After his preliminary analysis, Watkins performed his rate study, which utilized audited financial data from fiscal year 2007. Watkins' rate study focused on the water and sewer rates that became effective on July 1, 2008. Watkins opined that these rates were not fair and reasonable. Watkins' rate study concluded that the then existing water rate for out-of-town customers was 45.51% excessive, and that the sewer rate for out-of-town customers was 28.36% excessive. Watkins concluded that the water and sewer rates for out-of-town customers must be reduced by these percentages to be reasonable. However, Watkins conceded that rate making, while an objective process, involves a subjective element such that reasonable people may differ as to what a reasonable rate is.

Myron Olstein, a certified consultant with over 40 years of experience in the water and wastewater field, testified as an expert witness for the Town. Olstein testified that he had experience with cases involving unregulated, municipally-owned utilities throughout the country. Olstein had also completed rate studies for unregulated utilities in Virginia, and examined water and sewer rates in various localities in Virginia. Olstein had previously testified as an expert witness in cases involving municipal water and sewer rates, and as an expert before state regulatory bodies regarding water and sewer rates.

Olstein opined that the water rates for the out-of-town customers were "fair and reasonable," and that the sewer rates for the out-of-town customers were "practicable, equitable, and uniform." In formulating his opinion, Olstein spent at least 100 hours examining MFSG's report, reviewing Watkins' report, interviewing a number of persons, and reviewing various financial documents from the Town.

Olstein identified four justifications for his opinions and conclusions. First, Olstein testified that the Town's process of reviewing its water and sewer rates every five years, and hiring MFSG to perform a rate study, was sound and reasonable. According to Olstein, five years is the time period recommended in the rate manuals, and MFSG has excellent

8

qualifications as a rate consultant.  Olstein testified that the purposes of the study were to secure sufficient revenue, forecast future demand, and look at the rate-related objectives of the local governing body.  Olstein opined that it was necessary for the Town to adopt MFSG's recommendations, although he might have recommended a larger reserve.  Olstein did not believe that Watkins considered the recommended reserves in his calculation.

Second, Olstein stated that the Town customers are the owners of the utility, and as such, bear certain "owner's risks," which include the risk posed by damage to the water and sewer system, a change in regulations affecting the utility, a water main break, increases in demand, and an economic downturn.  Olstein considered these "owner's risks" in reaching his conclusion that the water and sewer rates charged to out-of-town customers were fair and reasonable.  Olstein stated that incorporating these risks into a rate is ultimately a qualitative rather than a quantitative assessment because many of the risks involve the probabilities of future events.  Olstein also said he did not know any Virginia municipality that actually quantified such risks.  Additionally, Olstein stated that these risks, which are borne by the Town, are independent of and in addition to the risk of default the Town bears on the bond issued to finance capital improvements to the

utility if revenue is insufficient to satisfy principal and interest payments. Olstein opined that given the risks borne by the Town as owners of the utility, it is "fair, reasonable, and equitable to impose a 100 percent rate differential on the out-of-town customers."

Third, Olstein disputed Watkins' testimony that there was essentially no cost difference in serving out-of-town versus in-town customers. Olstein performed calculations which supported his opinion that the demand for water services for the out-of-town customers is more variable than the demand of the in-town customers. Based on these calculations, Olstein concluded that it costs more to provide water service to the out-of-town customers than the in-town customers.

Fourth, Olstein testified that it was not uncommon for municipal water and sewer utilities to have a rate differential for out-of-town customers. Olstein stated that he could not recall a case where he did not look at other localities to present a rate comparison. According to Olstein, rate-setting bodies are interested in knowing how their rates compare to the rates of their peers, and the differential gives insight into how other localities have valued owner's risks in a qualitative way. Olstein testified that he relied on the range of differentials in preparing his report, and that the rate

10

differentials ran as high as 200% in Virginia, and as high as 300% nationally.

Regarding the MFSG study, Olstein opined that it was reasonable for MFSG to use the "cash needs" method in developing its proposed rates.  Olstein stated that the "cash needs" method was appropriate because it takes into account the payment the Town must make on its outstanding debt used to finance the utility.  Olstein further testified that it is appropriate to use the "cash needs" method in setting rates for municipal utilities because it ensures that the municipality has coverage for its debt obligations.  According to Olstein, the "utility" method is more appropriate for investor-owned utilities, as it provides for a rate of return or profit.  Further explaining this, Olstein stated:

> One of the things that rates have to do – not the
> only one, but an important one – is to allow the
> utility owner to finance the system.  If you're in
> the private sector, that means you have to show good
> return on equity.  If you are in the public sector,
> you are going to most likely be using revenue bond
> financing or some variant of that.  And in a revenue
> bond issue, you have to show coverage on a cash
> basis.

Olstein did not conduct an independent rate study, nor was he asked to by the Town.  However, Olstein independently reviewed MFSG's rate study and the rates enacted by the Town, and based on this review, concluded that the rates were fair, reasonable, and equitable.

11

After the parties rested, the circuit court took the matter under advisement. In a letter opinion, the circuit court held that the complainants had shown that "the existing surcharge for water and sewer for out-of-town residents is unfair, unreasonable, and inequitable; and that the surcharge for water and sewer service for out-of-town residents [is] impracticable, inequitable, non-uniform, and unlawful; and that the [complainants] have met their burden of proving the actions of the Town[] in enacting the rates unreasonable; and that the Town has failed to produce evidence to make the issue fairly debatable." The court entered a final order in favor of the complainants, and in that order, the court enjoined the Town from enforcing water and sewer rates for out-of-town customers in excess of a 45.51% reduction for water rates, and a 28.36% reduction for sewer rates. The court stayed enforcement of its order for ninety days, so that "the Town may consider the rates and the Court's opinion and Order." The court did not award the complainants monetary damages. The Town appealed from the circuit court's final order.

## DISCUSSION

The key issue in this appeal is whether the circuit court properly ruled that the Town failed to put forth some evidence of reasonableness of the water and sewer rates charged to out-of-town customers sufficient to make the issue fairly

debatable.  We hold that the circuit court erred in ruling that the Town failed to meet its burden under the fairly debatable standard.

This Court has held that "setting rates and fees for sewer or water services is a nondelegable legislative function." City of South Boston v. Halifax County, 247 Va. 277, 283, 441 S.E.2d 11, 15 (1994) (quoting County of York v. King's Villa, Inc., 266 Va. 447, 450, 309 S.E.2d 332, 333 (1983)).  Thus, the ordinance establishing such rates is afforded a presumption of validity.  Eagle Harbor L.L.C. v. Isle of Wight County, 271 Va. 603, 615, 628 S.E.2d 298, 304 (2006).  This presumption of legislative validity is a presumption of reasonableness.  Board of Supervisors v. Robertson, 266 Va. 525, 532, 587 S.E.2d 570, 575 (2003); Board of Supervisors v. McDonald's Corp., 261 Va. 583, 590, 544 S.E.2d 334, 338 (2001); Board of Supervisors v. Snell Constr. Corp., 214 Va. 655, 659, 202 S.E.2d 889, 893 (1974).  Legislative action is reasonable if the matter at issue is fairly debatable.  Robertson, 266 Va. at 532, 587 S.E.2d at 575.  An issue is fairly debatable "when the evidence offered in support of the opposing views would lead objective and reasonable persons to reach different conclusions."  Board of Supervisors v. Williams, 216 Va. 49, 58, 216 S.E.2d 33, 40 (1975).  Under the fairly debatable standard, "[t]he governing body is not required to go forward with evidence sufficient to

13

persuade the fact-finder of reasonableness by a preponderance of the evidence."  Ames v. Town of Painter, 239 Va. 343, 348, 389 S.E.2d 702, 704 (1990).

We have stated the following principles for determining whether the presumption of reasonableness in a particular case should prevail or is overcome:

> Where presumptive reasonableness is challenged by probative evidence of unreasonableness, the challenge must be met by some evidence of reasonableness.  If evidence of reasonableness is sufficient to make the question fairly debatable, the [legislative action] 'must be sustained'.  If not, the evidence of unreasonableness defeats the presumption of reasonableness and the [legislative action] cannot be sustained.

Robertson, 266 Va. at 533, 587 S.E.2d at 575 (citations omitted).

The General Assembly has expressly granted localities the power to provide and operate water and sewer facilities, and has placed limitations on the rates that localities' governing bodies may charge for water and sewer services.  Code §§ 15.2-2119, -2143.  Specifically, Code § 15.2-2143, titled "Water supplies and facilities," provides that localities' governing bodies may only charge "fair and reasonable" fees for water services.  Similarly, Code § 15.2-2119, titled "Fees and charges for sewer services," provides that localities' governing bodies may only charge fees "as the governing body

14

deems practicable[,] equitable, [and] uniform" for sewer services.

On appeal, the Town argues that it offered sufficient evidence to prove that the issue of reasonableness of the rates is fairly debatable. The Town asserts that the fairly debatable standard imposes a low burden on the Town, which it met with sufficient probative evidence of the rates' reasonableness. Specifically, the Town contends that it met this low burden by presenting expert testimony from Olstein that the water rate for out-of-town customers was fair and reasonable, and that the sewer rate for out-of-town customers was practicable, equitable, and uniform.

The Town also asserts that the circuit court improperly applied the fairly debatable standard. According to the Town, the circuit court treated this case as a battle of the experts by improperly weighing the opinions, reasoning, and methodologies utilized by the opposing experts. In doing so, the Town contends that the circuit court failed to give effect to the Town's evidence that supported the reasonableness of the rates.

The complainants respond that the circuit court properly applied the fairly debatable standard and correctly ruled that the Town failed to present sufficient evidence to meet its burden under that standard. The complainants focus their

argument on assailing Olstein's testimony, asserting that his testimony was not sufficient to make the issue of the rates' reasonableness fairly debatable. Continuing with this argument, the complainants note that Olstein did not conduct an independent rate study to support his opinion or provide any nexus between the rates he deemed reasonable and the costs and risks borne by the Town as owner of the utility. The complainants conclude that the circuit court properly ruled that Olstein's testimony was not sufficient to satisfy the Town's burden under the fairly debatable standard.

In Board of Supervisors v. Stickley, 263 Va. 1, 556 S.E.2d 748 (2002), this Court addressed a Board of Supervisors' denial of an application by a landowner, Stickley, for a special use permit to raise and release game birds on his property. The Board denied Stickley's application, citing concerns from poultry companies about the possibility of wild game birds carrying disease into local poultry farms in the area. Id. at 5-6, 556 S.E.2d at 751. In a proceeding in the circuit court filed by Stickley to declare the Board's action unreasonable, arbitrary, and capricious, both parties presented expert witnesses who testified about the risk of disease posed to the local poultry industry by the wild birds. Id. at 7-8, 556 S.E.2d at 752. After summarizing the various expert witnesses' testimony regarding this issue, this Court stated:

16

> The question in this case is not who presented the greatest number of expert witnesses or even who won the battle of the experts. Rather, the question is whether there is any evidence in the record sufficiently probative to make a fairly debatable issue of the Board's decision to deny Dr. Stickley a special use permit.

Id. at 11, 556 S.E.2d at 754.

As this Court stated in Stickley, the issue in this case is not who won the battle of the experts. Accordingly, this Court need not critically examine and contrast the methodologies, processes of reasoning, and calculation methods used by the opposing experts in formulating their opinions. Rather, the Court need only examine whether any evidence in the record is sufficiently probative to make a fairly debatable issue of the fairness and reasonableness of the water rate charged to out-of-town customers, and the practicability, equitableness, and uniformity of the sewer rate charged to out-of-town customers. Olstein's testimony that the water rate charged to out-of-town customers is fair and reasonable, and that the sewer rate charged to out-of-town customers is practicable, equitable, and uniform, supported by his justifications for his opinion, is sufficient to make the issue fairly debatable.[3] Accordingly, we will reverse the judgment of

---

[3] Having reached this conclusion, the Court need not consider the Town's additional assignments of error. Additionally, we find no merit in the complainants' assignments of cross-error.

17

the circuit court and enter final judgment in favor of the Town.

<u>Reversed and final judgment.</u>

SENIOR JUSTICE RUSSELL, with whom JUSTICE MIMS joins, dissenting.

As the majority opinion points out, the Town has had, for many years, the exclusive right to furnish water and sewer services to an area of Loudoun County outside the Town. The Town's out-of-town customers, however, have no voting rights in the Town and are not constituents of the Town Council members who set their utility rates. As to those customers, the Town operates an unregulated monopoly. As the majority opinion also points out, many other states have subjected such municipal monopolies to regulation by the state's regulatory authority, but our General Assembly has not seen fit to subject them to regulation by the State Corporation Commission. This situation operates to the disadvantage of a large number of Virginians in addition to the complainants in the present case. Five <u>amici</u> <u>curiae</u>[1] state on brief that more than 80 Virginia cities and towns, located in more than 50 counties, serve out-of-town customers and charge them higher rates than their own constituents. Approximately 140,000 residents of Fairfax

18

County alone are dependent on water supplied by cities and towns in which they do not reside and in which they cannot vote.

In this appeal, Leesburg's out-of-town customers, the prevailing parties in the circuit court, assign cross-error to the circuit court's application of the "fairly debatable" standard in these circumstances.  We granted them an appeal on that assignment of cross-error, but the majority opinion does not mention it.  Rather, the majority opinion begins its discussion with the holding:  "The key issue in this appeal is whether the circuit court properly ruled that the Town failed to put forth some evidence of reasonableness . . . sufficient to make the issue fairly debatable."  That holding ignores the fundamental question, fairly presented in this appeal, whether the "fairly debatable" standard properly applies at all.

We consistently adhere to the "fairly debatable" standard because of the constitutional principle of separation of powers.  It is not the proper function of the judicial branch of government to second-guess legislative judgments made by the duly-elected representatives of the people.  Neither the wisdom of legislative enactments nor the motivations of those enacting them are subject to judicial review.  The majority opinion

---

[1] Virginia Association of Counties, Virginia Water & Waste Authorities Association, County of Fairfax, County of Loudoun,

correctly states those principles and cites a number of our decisions adhering to them.  Each of those decisions, however, deals with the ordinary situation in which a legislative body has made a decision operating upon its own constituency and affecting the territory it was elected to govern.  The rationale underlying the "fairly debatable" standard is that the decision affects those who elected the legislators, empowering those elected to make decisions for them.  If displeased by those decisions, the voters have a ready remedy at the next election.

In the case of legislative acts affecting persons and territory outside the jurisdiction in which the legislative body has the authority to govern, the rationale supporting the "fairly debatable" standard is non-existent.  A town council's decision setting utility rates outside the town should be accorded no more deference than the decision of the board of directors of a private business operated for profit.[2]

Because the Town, as to its out-of-town customers, is shielded from the competitive forces affecting private business

_____

and Fairfax County Water Authority.

[2] Members of the Town Council may in fact have had the best of intentions, but they had an obvious incentive, in setting disparate rates, to please their constituents at the expense of those who could not vote.  The existence of such an incentive demonstrates the unsoundness of legislative deference in these circumstances.

20

and operates as an unregulated monopoly, the General Assembly has provided some protection for the out-of-town customers. That protection consists solely of the requirement of Code § 15.2-2143 that water rates be "fair and reasonable" and the requirement of Code § 15.2-2119 that sewer rates be "practicable[,] equitable [and] uniform."  The application of those standards is committed to the courts.  In applying them, in the absence of any reason for deference to legislative decisions, the courts should be guided by the rules applicable to any civil litigation between private parties.  The complaining parties should bear the initial burden of showing that the rates violate the statutory standards.  The burden should then shift to the rate-making body to rebut that showing.  The fact-finder should then decide the issue by the preponderance of the evidence.

If the "fairly debatable" standard is applied to such cases, the out-of-town customers are left to the mercies of an unregulated monopoly against which they have no redress either at the polls or in the courts.  If litigation such as this is subjected to the "fairly debatable" standard, the rate-making body, to prevail, needs only to find an expert witness who will opine that the rate-maker's pre-determined decision was "fair and reasonable" with respect to water rates, or "practicable[,] equitable [and] uniform" with respect to sewer rates.  That

will end the case, no matter how persuasive the complainants' evidence may have been.[3]  That seems to me to lead inevitably to an unjust result, defeating the protections the General Assembly sought to provide.  Nevertheless, it is precisely what will have occurred here as a result of the majority opinion. For that reason, I respectfully dissent.

I would affirm the decision of the circuit court.  That court, after carefully reviewing the evidence, found the Town's evidence insufficient to overcome the complainants' evidence of unreasonableness even applying the very low "fairly debatable" standard.  A fortiori, the Town's evidence would have failed to meet the more stringent standard of proof by a preponderance of the evidence.  See, e.g., Ames v. Town of Painter, 239 Va. 343, 348, 389 S.E.2d 702, 704 (1990) (distinguishing "preponderance of the evidence" and "fairly debatable" standards).  Because a pure question of law is presented here, and no further evidence

---

[3] The complainants concede that the Town is entitled to collect a surcharge in some amount to cover the Town's "owner's risk."  Their expert witness calculated the amount of such an added charge, which the circuit court found fair and reasonable.  The Town's expert, however, made no such calculation but contented himself with merely concluding that the Town's previously adopted "policy decision" to impose a 100% surcharge on out-of-town customers was reasonable.  His only justification for that conclusion was that surcharges imposed by other jurisdictions are worse.  He said that they ran as high as 200% in Virginia and 300% nationally.  Pressed, he conceded that 500% might cross the boundary of reasonableness.  That is the evidence the majority opinion found sufficient to meet the "fairly debatable" standard.

or fact-finding is needed, remand is unnecessary and final judgment should be entered here.  See Perry v. Commonwealth, 280 Va. ___, ___ S.E.2d ___ (2010) (this day decided).

Our people are not noted for their docility in the face of monetary exactions imposed upon them by a government in which they have no voice.  In the late eighteenth century, a similar grievance led to considerable unpleasantness in this country, leading to a fundamental change of government.  That grievance also arose from the fact that those aggrieved had no redress either at the polls or in the courts.