# COURT OF APPEALS OF VIRGINIA

## Record No. 1042-25-3

JAMES R. GARRETT, ET AL.
v.
ROANOKE CITY COUNCIL, ET AL.

Present: Judges O'Brien, Lorish and Senior Judge Humphreys
Argued by videoconference

Opinion Issued June 2, 2026

**FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE**
Leisa K. Ciaffone, Judge

Carrol M. Ching (John P. Fishwick, Jr.; Daniel J. Martin; Zoë E. Dye; Fishwick & Associates PLC, on briefs), for appellants.

James J. O'Keeffe (Timothy R. Spencer, City Attorney; Laura Carini, Deputy City Attorney; Jennifer Braxton, Assistant City Attorney; Joshua C. Johnson; Michie Hamlett, PLLC, on brief), for appellees.

## PUBLISHED OPINION BY
### JUDGE LISA M. LORISH

Several neighbors ("Neighbors") filed suit seeking relief from the City of Roanoke's decision to rezone several parcels of land located along Medmont Circle from R-12, residential single-family, to mixed use planned unit development ("MXPUD"), enabling the construction of 24 townhomes. The trial court sustained a demurrer to the suit, rejecting Neighbors' procedural and substantive challenges to the rezoning. On appeal, Neighbors argue that the City's Planning Commission exceeded its authority by continuing the public hearing about the rezoning application that began at one regular meeting of the Planning Commission for further consideration at the next regularly scheduled meeting. Even if a hearing can generally be continued, Neighbors argue the Planning Commission failed to provide adequate advertising

notice of the meeting when the public hearing was completed because (1) an intervening amendment to Code § 15.2-2204 changed the relevant advertising requirements; and (2) the developer made changes to the application.

A local planning commission must hold regularly scheduled meetings, and it has an implied right to continue a hearing reasonably from one meeting to another. A planning commission must advertise its intent to recommend "any plan, ordinance or amendment" at an upcoming public meeting as required by statute. Code § 15.2-2204. If the public had proper notice that a hearing was scheduled for a particular meeting, and the hearing is reasonably continued to be completed at a later meeting, no additional advertising notice is required. The amended statute did not apply retroactively to change the advertising requirements for a properly noticed hearing that already started. Because the Planning Commission gave statutorily compliant notice for the hearing that began at its regularly scheduled June 10, 2024 meeting, we find that the Planning Commission had authority to continue the hearing and to later recommend approval of the rezoning application when the hearing was completed at its July meeting. We also find that no readvertising was required when the developer made non-substantive changes to the application pending before the Planning Commission. Finally, we find that the Roanoke City Council (the "Council") did not err in concluding that the project met the MXPUD requirements and that evidence in the record shows that the rezoning was fairly debatable. For these reasons, we affirm the judgment below.

BACKGROUND

a. The Project and Plans

In late 2023, ABoone Real Estate, Inc. ("ABoone") filed an application for the rezoning of several lots located on Medmont Circle from "R-12, Residential Single-Family" to "MXPUD, Mixed Use Planned Unit Development" (the "Application"). ABoone proposed building 24

townhomes upon the roughly 3.5 acres as well as widening Medmont Circle from 18.5 feet to 22 feet, with 4 additional feet for gutter pans (the "Medmont Project"). The parcels, located in the City's Greater Deyerle neighborhood, are bordered by "a large regional medical center" to the north across Keagy Road and "less intensive residential uses to the east, south, and west," specifically "[s]ingle-unit detached dwellings."

The City has both a comprehensive "City Plan 2040" (the "Comprehensive Plan") and a plan for the neighborhood (the "Greater Deyerle Neighborhood Plan"). The Comprehensive Plan sets out several "Big Ideas," which include establishing "[c]omplete [n]eighborhoods," "[m]issing [m]iddle [h]ousing," and "[u]sing our [l]and [b]etter." Acknowledging future growth, the Comprehensive Plan also sets forth policies that "focus on compact development that takes into account surrounding neighborhood characteristics and patterns." The earlier-adopted Greater Deyerle Neighborhood Plan lists several "priority initiatives," including to "[m]aintain the existing general land use patterns, while giving greater consideration to specific zoning changes" as recommended by the plan, and to "[m]aintain the current residential zoning on Keagy Road." Also recognizing future growth, the plan notes the need to "maximize[] the land" "while remaining sensitive to the existing neighborhood environment," and describes the possibility of rezoning some land as MXPUD.

### b. The Rezoning Process

The Planning Commission holds a monthly meeting. Roanoke City Code § 36.2-813. It first placed the Application on the agenda for its February 12 meeting. Before that meeting, ABoone amended its initial application. Then, at the February 12 meeting, the matter was continued to June 10 at ABoone's request. Minutes from the February 12 meeting reflect that two of the Neighbors were "present and advised that their comments would be held until the June

10, 2024, Planning Commission public hearing, or as soon thereafter as the matter may be heard." ABoone amended the initial application again in May 2024.

The Planning Commission provided public hearing notices in the June 3 and June 10 editions of *The Roanoke Times*. Then, at the June 10 meeting, ABoone again requested a continuance, explaining that they were working "to come up with a better plan." The Planning Commission chair explained that, after the Planning Commission considered the continuance request, he would "open the public hearing for anyone wishing to address the Commission today." After the Planning Commission unanimously voted to grant the continuance to their July 8 meeting, the chair explained, "[S]ince there are speakers here, we're opening the public hearing for—to give them the opportunity to speak should they wish." Four people (including some of the Neighbors) then spoke in opposition to the Application, "citing concerns of traffic safety, environmental impact, and increased density." Following these comments, the Planning Commission stated that "the public hearing portion of this matter remains open" until the July 8 meeting.

On June 25, ABoone amended the Application yet again. The amended Application increased the tree canopy by five percent, specified that the setbacks were outlined in the development plan rather than describing them by reference to the applicable City ordinance, revised the phrasing of the description of the buildings' siding, and added renderings of the exteriors of the proposed townhomes.

In advance of the July 8 meeting, the Planning Commission published public hearing notices in *The Roanoke Times* on July 1 and July 8. During the continued hearing at that meeting, representatives from ABoone presented about the Application and more than a dozen individuals (again including some Neighbors) spoke as well. Most of those individuals expressed various concerns, including potential personal liability, stormwater, traffic, lack of

affordability, and more. City staff, however, expressed support for the Application, finding it to be "consistent with the general principles of the City's [C]omprehensive [P]lan, the Greater Deyerle [N]eighborhood [P]lan, and the zoning ordinance." The Planning Commission then voted unanimously to recommend the Application.

In anticipation of the next Council meeting, the Planning Commission prepared a report recommending adoption of the Application (the "Report"). Among other things, the Report described how the Application was consistent with the Comprehensive and Greater Deyerle Neighborhood Plans and summarized interdepartmental comments and public comments. The Report also mentioned density, stormwater, traffic, tree canopy, and the issue of "potential wetlands."

The Council met on July 15 to consider the Application. The public hearing began with ABoone representatives discussing the need for and benefits of the Medmont Project and addressing concerns, including traffic and stormwater. Again, more than a dozen residents expressed their opposition and concerns, which echoed those voiced at the Planning Commission meetings, but not all residents were opposed. The public hearing then closed, and the Council unanimously approved the Application.

c. The Subsequent Litigation

Following the Council's approval of the Application, Neighbors[1] filed suit against the Council and John A. Carter Rental Properties, LLC, Keagy Medmont, LLC, and ABoone (collectively, the "Developers") seeking declaratory judgment and injunctive relief. Neighbors argued that the advertised notice for the July 8 Planning Commission hearing was insufficient,

_____

[1] The group of Neighbors includes James R. Garrett, Ellen Ann Harvey-D'Ardenne, Michael F. Farrell, Karyn B. Farrell, William A. Harrison, Jr., Matthew R. Goff, Jordan L. Goff, Charlotte D. McCauley, Thomas E. Wray, Paul F. Glassbrenner, Kathryn E. Glassbrenner, John Michael Dilauro, Pamela R. Dilauro, and David G. Harrison, individually and as trustee for the David George Harrison Revocable Trust.

that the Council acted outside of its authority in approving the Application because the entirely residential Medmont Project did not qualify as mixed use, and that the Council's decision was arbitrary, capricious, and unreasonable. The trial court granted the Council and Developers' motion craving oyer, making the "full legislative record" and numerous documents part of the pleadings.

The trial court later sustained the Council and Developers' demurrer and dismissed the complaint with prejudice. First, the court held that the Planning Commission had inherent authority to continue the June 10 hearing and that notice for the July 8 hearing was sufficient. The trial court also found that the Medmont Project met the definition of an MXPUD, that Neighbors "failed to put forward 'probative evidence' of the rezoning's unreasonableness," and that, in the alternative, the Council and Developers "presented evidence to make the issue fairly debatable." Neighbors now appeal.

ANALYSIS

"We review whether the circuit court properly granted defendants' demurrer de novo." *EMAC, LLC v. Cnty. of Hanover*, 291 Va. 13, 20 (2016). "When reviewing a decision sustaining a demurrer, the Court must determine whether the allegations of the underlying pleading established 'a foundation in law for the judgment sought.'" *Historic Alexandria Found. v. City of Alexandria*, 299 Va. 694, 696 (2021) (quoting *Eagle Harbor, LLC v. Isle of Wight Cnty.*, 271 Va. 603, 611 (2006)). "In making this determination, the Court accepts the facts alleged in the pleading as true and all reasonable inferences that may be drawn from those facts." *Id.*

Still, "documents brought into a case as a result of a motion craving oyer are incorporated into the pleadings and may be used to 'amplif[y]' the facts alleged in a complaint when a court decides whether to sustain or overrule a demurrer." *EMAC*, 291 Va. at 21 (alteration in original) (quoting *Dodge v. Trs. of Randolph-Macon Woman's Coll.*, 276 Va. 1, 5 (2008)). "[A] court

- 6 -

considering a demurrer may ignore a party's factual allegations contradicted by the terms of authentic, unambiguous documents that properly are a part of the pleadings." *Id.* (quoting *Schaecher v. Bouffault*, 290 Va. 83, 107 (2015)).

I. A planning commission has inherent authority to reasonably continue a hearing.

Neighbors argue that the trial court erred in finding that the Planning Commission had general "inherent authority" to continue consideration of the Application from its June 10 meeting to the meeting scheduled for July 8. Instead, Neighbors argue that planning commissions may only continue consideration of a matter if "weather or other conditions" make it "hazardous for members to attend the meeting" as outlined in Code § 15.2-2214.

In Virginia, "[t]he Dillon Rule of strict construction controls our determination of the powers of local governing bodies," including the authority of planning commissions. *Bragg Hill Corp. v. City of Fredericksburg*, 297 Va. 566, 578 (2019) (quoting *Marble Techs., Inc. v. City of Hampton*, 279 Va. 409, 417 (2010)). "Municipalities have only those powers that are (1) expressly granted by the General Assembly, (2) 'necessarily or fairly implied' from those express powers, and (3) 'essential to the declared objects and purposes' of the municipality." *Id.* (first quoting *City of Chesapeake v. Gardner Enters.*, 253 Va. 243, 246 (1997); and then quoting *Stallings v. Wall*, 235 Va. 313, 315-16 (1988)).

When we interpret a statute, we start with the text. "In applying the Dillon Rule, we first examine the plain terms of the legislative enactment to determine whether the General Assembly expressly granted a particular power to the municipal corporation." *Dumfries-Triangle Rescue Squad, Inc. v. Bd. of Cnty. Supervisors*, 299 Va. 226, 233 (2020) (quoting *Marble Techs., Inc.*, 279 Va. at 418). If a power is not expressly granted, we must determine whether "the legislature intended that the grant of the express also would confer the implied." *Marble Techs., Inc.*, 279 Va. at 418 (quoting *Commonwealth v. Bd. of Arlington Cnty.*, 217 Va. 558, 577 (1977)).

The General Assembly not only authorized, but required, every locality in Virginia to "create a local planning commission in order to promote the orderly development of the locality and its environs." Code § 15.2-2210. Commissions are required to "fix the time for holding regular meetings," and they must "meet at least every two months" unless the locality has a population of 7,500 or fewer residents.[2] Code § 15.2-2214. By statute, commissions shall "[e]xercise general supervision of, and make regulations for, the administration of its affairs" and "[p]rescribe rules pertaining to its investigations and hearings." Code § 15.2-2221(1)-(2). The "commission shall hold at least one public hearing on a proposed ordinance or any amendment of an ordinance, after notice as required by § 15.2-2204, and may make appropriate changes in the proposed ordinance or amendment as a result of the hearing." Code § 15.2-2285(A). If the commission fails to "report 100 days after the first meeting of the commission after the proposed amendment or reenactment has been referred to the commission, or such shorter period as may be prescribed by the governing body," the failure to act is "deemed approval, unless the proposed amendment or reenactment has been withdrawn by the applicant prior to the expiration of the time period." Code § 15.2-2285(B).

As to Neighbors' contention that the Planning Commission lacked the authority to continue consideration of the project from one regularly scheduled meeting to another regularly scheduled meeting, both the statutory framework and common sense suggest otherwise. This case involved a rezoning application. The Planning Commission is expressly authorized by statute to make a recommendation to the Council about whether the application should be approved or denied. Code § 15.2-2285(A). And the Planning Commission is expressly granted

---

[2] For example, the public hearings of the Planning Commission relevant to this appeal were all scheduled for 1:30 p.m. on the second Monday of each month. The Commission generally holds public hearings on the second Monday of every month. *Planning Commission*, Roanoke Plan., Bldg. & Dev., https://perma.cc/8RNL-W2L6 .

the authority to "[e]xercise general supervision of . . . the administration of its affairs" and to "[p]rescribe rules pertaining to its investigations and hearings." Code § 15.2-2221(1)-(2). The powers expressly granted imply that the Planning Commission can choose when to schedule discussion about a particular project. *See Marble Techs., Inc.*, 279 Va. at 418. It is also implied that the Planning Commission can choose to reschedule discussion about a particular project, or to continue discussion over multiple meetings. *See id.*

Here, the Planning Commission used its implied authority to put the Application on the agenda for its June 10 meeting. At that meeting, ABoone asked the Planning Commission to continue its decision on the Application until the next regularly scheduled meeting on July 8. The Planning Commission used its implied authority to vote to continue final consideration of the matter, while also formally opening the public hearing to allow several individuals to speak in "opposition" to the pending application.[3] This is within the Planning Commission's authority to "general[ly] supervis[e]" the "administration of its affairs." Code § 15.2-2221(1).

We cannot find any language in the statute that "is so strong as to preclude" an implied, reasonably exercised authority to continue the decision on a pending application to a later meeting. *See Dumfries-Triangle*, 299 Va. at 235. Indeed, the Planning Commission's statutory duty to make recommendations on pending applications would be frustrated if the Planning Commission could not set its own agendas and move matters from one meeting to another to account for factors like the availability of the parties involved, developments in the application, or outside events.

Neighbors suggest that Code § 15.2-2214's provision allowing the rescheduling of regular meetings because of weather or other hazardous conditions implies that the Planning

---

[3] Following these comments, the Planning Commission stated that "the public hearing portion of this matter remains open" until the July 8 meeting.

Commission could not reschedule a discussion about a particular project. This confuses apples (the meeting itself) for oranges (matters discussed at a particular meeting). As recounted earlier, planning commissions are required to "fix the time for holding regular meetings," and must generally "meet at least every two months." Code § 15.2-2214. The portion of the statute Neighbors focus on states that if "weather or other conditions are such that it is hazardous for members to attend the meeting," the chairperson, or vice-chairperson if the chairperson is unable to act, can declare that such conditions exist, and the commission can continue that regularly scheduled meeting to another date. *Id.* In such a case, the chairperson is required to communicate this to "the members [of the planning commission] and the press as promptly as possible," but the Planning Commission is not required to redo advertising for each "matter[] previously advertised" for the regularly scheduled date. *Id.* The power to change a regularly scheduled meeting date is understandably limited because the public has the right to expect that the Planning Commission meet every month as promised. But the public has no right to dictate when the Planning Commission decides to take up a particular matter for consideration. This statute does not address the continuance of a public hearing from one regularly scheduled meeting to another, so it does not undermine our conclusion that the Planning Commission has the implied power to continue a matter.

With that said, an implied power must be implemented in a reasonable manner, and the Commission's power to schedule—and reschedule—a matter for consideration is no exception. *See City of Va. Beach v. Hay*, 258 Va. 217, 222 (1999) ("[T]he chosen method is unreasonable if it is contrary to legislative intent or inappropriate for the ends sought to be accomplished by the grant of the power."); *Bd. of Arlington Cnty.*, 217 Va. at 577 (holding that "the test in application of the doctrine [of implied powers] is reasonableness, in which concern for what is necessary to promote the public interest is a key element"). If a hearing is excessively delayed, or

deliberately moved to circumvent meaningful public participation, it could be unreasonable under the circumstances. *See Hay*, 258 Va. at 222 (noting that reasonableness "will depend upon the circumstances of each case"); 1996 Op. Va. Att'y Gen. 62, 65 (concluding that "a six-month time lapse is excessive to support an argument that the [later] hearing constitutes a continuance of the [earlier] hearing").[4] Absent evidence that a meeting was continued with nefarious intent, or in a manner that prevented meaningful public participation, the routine decision to move hearings and other matters from one regularly scheduled meeting to another regularly scheduled meeting is reasonable.

To sum up, the Planning Commission reasonably exercised its authority to continue its final consideration of the Application from the June 10 meeting to the July 8 meeting. Neighbors suggest no reason why the continuance was unreasonable. To the contrary, as discussed below, ABoone used the continuance to submit a revised application that increased the tree canopy for the project and provided visual renderings of the exterior of the proposed buildings so everyone could better understand the project. Under these circumstances, the Planning Commission did not exceed its authority to continue resolution of the matter, and the trial court did not err in concluding the same.

II. The Planning Commission was not required to readvertise that consideration of the Application would continue at the July 8 meeting.

Neighbors next contend that, even if final consideration of the Medmont Project was properly continued to the July 8 meeting, the Planning Commission failed to meet the statutory advertising requirements to allow it to recommend the Application at that meeting. Neighbors first assert that, other than the narrow exception in Code § 15.2-2214, Code § 15.2-2204(A)

---

[4] Generally, several opinions of the Attorney General agree that matters properly noticed for one meeting of a local governing body "may be continued for conclusion to a date, time and place certain in the future." 1972-73 Op. Va. Att'y Gen. 489, 489 (discussing the Virginia Freedom of Information Act); 1991 Op. Va. Att'y Gen. 5, 7 (same).

requires *all* hearings to be advertised in advance, and the Planning Commission's advertisement of the July 8 meeting failed to comply with the amended Code § 15.2-2204(A). As a fallback, Neighbors argue that ABoone's amendment to the Application, made between the June 10 and July 8 meetings, was substantive and thus triggered a requirement for the July 8 meeting to be readvertised. We agree with Neighbors that the statute requires all hearings to be advertised in advance, but if a hearing is opened and continued, it need not be readvertised. Because Code § 15.2-2204(A) only requires advertisement of the time and place of the meeting at which the hearing on a matter will *begin*, the intervening amendment to Code § 15.2-2204(A) does not change the analysis. Finally, we reject the idea that non-substantive amendments to an application require a planning commission to readvertise.[5]

## A. Readvertisement of a Continued Hearing

To address Neighbors' first argument, we turn to the statute requiring advertisement. "When construing a statute, [the Court's] primary objective 'is to ascertain and give effect to legislative intent,' as expressed by the language used in the statute." *Burkholder v. Palisades Park Owners Ass'n*, 76 Va. App. 577, 583 (2023) (alteration in original) (quoting *Va. Elec. & Power Co. v. State Corp. Comm'n*, 295 Va. 256, 262-63 (2018)). "We must determine the legislative intent by what the statute says and not by what we think it should have said." *Id.* (quoting *Miller & Rhoads Bldg., LLC v. City of Richmond*, 292 Va. 537, 541-42 (2016)).

"Code §[] 15.2-2204(A) and (B) contain certain advertising and written notice requirements applicable when, inter alia, a governing body intends to adopt a comprehensive plan, zoning ordinance, or amendment thereof." *Oak Valley Homeowners Ass'n v. Prince*

---

[5] Under our recent decision in *Bd. of Cnty. Supervisors of Prince William Cnty. v. Oak Valley Homeowners Ass'n*, 87 Va. App. 201, 248 (2026), it is irrelevant that all the Neighbors appear to have had actual notice that the hearing was continued to be completed at the July 8 meeting. There, we held that the "actual-notice-waiver provision in subsection B of Code § 15.2-2204 does not excuse advertising deficiencies under subsection A." *Id.*

*William Cnty. Bd. of Supervisors*, 85 Va. App. 382, 392 (2025) ("*Oak Valley I*") (quoting

*Norfolk 102, LLC v. City of Norfolk*, 285 Va. 340, 356 (2013)). The amended version of Code

§ 15.2-2204(A), which took effect between the June and July meetings, stated that a planning

commission cannot recommend nor can a local governing body "adopt any plan, ordinance or

amendment . . . until notice of intention to do so has been published twice . . . with the first

notice appearing no more than 28 days before and the second notice appearing no less than seven

days before the date of the meeting referenced in the notice." 2024 Va. Acts ch. 225 (amending

Code § 15.2-2204(A)) (effective July 1, 2024). Neighbors do not contest that the Planning

Commission gave adequate notice that the Medmont Project would be considered at the June 10

meeting under the version of Code § 15.2-2204(A) that was in effect at the time. Instead, they

argue that under the new version of the statute, the Planning Commission lacked the authority to

make a recommendation on the project because the July 8 meeting was not properly advertised.[6]

Our Court recently explained that "compliance with the advertising requirements of Code

§ 15.2-2204(A) . . . is essential for a local governing body to have the power to enact a zoning

ordinance." *Bd. of Cnty. Supervisors of Prince William Cnty. v. Oak Valley Homeowners Ass'n*,

87 Va. App. 201, 249 (2026) ("*Oak Valley II*"). And an earlier decision from our Supreme Court

concluded that a planning commission's failure to comply with the statutory advertising

requirements rendered the ordinance ultimately adopted void ab initio. *City Council of*

*Alexandria v. Potomac Greens Assocs. P'ship,* 245 Va. 371, 378 (1993). Neighbors argue that

the Planning Commission had no power to recommend "any plan, ordinance or amendment,"

---

[6] It is uncontested that the Planning Commission gave additional advertising notice
before the July meeting and that the second notice was published on the same day as the meeting,
not seven days before as the statute then required. The statute was amended again after this to
require the second notice appear "no less than five days" before the date of the meeting. 2025
Va. Acts ch. 52 (amending Code § 15.2-2204(A)) (effective July 1, 2025).

because the second notice of the July 8 meeting did not appear "no less than seven days before the date of the meeting referenced in the notice." Code § 15.2-2204(A).

The question here is whether the statute links the advertising requirement to the meeting where a local planning commission first takes up a matter and opens the public hearing, or to the moment when the local planning commission ultimately makes a decision to recommend or deny a given application. We think that the advertising requirement is logically tied to the initial meeting under the plain text of Code § 15.2-2204(A). Reading the statute to require advertisement only before the meeting where the public hearing begins is also consistent with the rest of the statutory scheme.

The advertising requirement in Code § 15.2-2204(A) "protects the *public's* right to notice through newspaper advertising, a procedural safeguard ensuring broad community participation in important land-use decisions." *Oak Valley II*, 87 Va. App. at 257. The point of the requirement is to ensure that "persons affected may appear and present their views" to the local planning commission or governing body. Code § 15.2-2204. Input from the public is critical, which is why a planning commission "shall hold at least one public hearing on a proposed ordinance or any amendment of an ordinance, after notice as required by § 15.2-2204." Code § 15.2-2285. But nothing in these provisions, or any other part of the statutory scheme, requires a local planning commission to make its decision at the public hearing itself.

Instead, Code § 15.2-2285 anticipates the opposite—that a local planning commission's final recommendation on a proposed amendment to the zoning ordinance will come *after* the public hearing is completed. First, the statute expressly authorizes the commission to "make appropriate changes in the proposed ordinance or amendment *as a result of the hearing.*" *Id.* Then, "[u]pon the completion of its work, the commission shall present the proposed ordinance

- 14 -

or amendment including the district maps to the governing body together with its recommendations and appropriate explanatory materials." *Id.*

Advertisement notice is only relevant to the first part of the process—the public meeting. This is the point when the public needs to know a meeting is taking place so that interested persons can "appear and present their views" for consideration. Code § 15.2-2204. But because hearing and considering comments from the public is not a mere statutory box to check, the planning commission may need more time to consider those comments and make potential changes before finalizing a recommendation for the governing body. An affirmative recommendation from a planning commission, made without the opportunity for public input, is void ab initio. But once notice that a hearing will take place is properly given, the planning commission has the authority to act.

As discussed before, the planning commission also has the power to reasonably continue a public hearing from one meeting to another hearing. When a hearing is so continued, Code § 15.2-2204 does not require readvertisement for the second meeting. The absence of a readvertisement requirement is telling because the same statute, in subsection B, expressly requires additional *mailing* notice when a hearing is continued if a proposed amendment involves a "change in the zoning map classification of 25 or fewer parcels of land." No additional mailing notice is required, however, if a proposed change involves "more than 25 parcels of land." Code § 15.2-2204(B). And in no circumstance is additional advertising notice required. This is unsurprising given that the General Assembly has not even required additional advertising notice if a regularly scheduled meeting is moved completely. Code § 15.2-2214 ("[a]ll hearings and

other matters previously advertised for such meeting shall be conducted at the continued meeting and no further advertisement is required").[7]

So, the statute's advertising requirement is tied to the meeting when the public hearing begins, and there is no general requirement to readvertise that the public hearing was continued for completion at a later meeting. For these reasons, the fact that amendments to Code § 15.2-2204 took effect between the two meetings does not matter. Any member of the public who was interested in the hearing knew about it from the original advertising. If they attended the meeting where the hearing began, they received actual notice that the hearing would be continued to a later meeting. If they did not attend, the same information would be reflected in the publicly available meeting minutes.

This is also consistent with other principles of statutory interpretation. "[A] statute is always construed to operate prospectively unless a contrary legislative intent is manifest." *Berner v. Mills*, 265 Va. 408, 413 (2003). One exception is when a statute affects procedure and not substantive or vested rights. *Montgomery v. Commonwealth*, 75 Va. App. 182, 189-90 (2022). When courts apply "a [new] procedural rule in a pending action, they are not actually applying the rule 'retroactively.' Instead, they are simply noting that the law in effect when the cause of action arose does not govern the procedural aspects of the case, but the law in effect when the procedure itself takes place does." *Id.* at 191 n.7. Another exception is when the "General Assembly uses explicit terms detailing the retroactive effect of the legislation." *Id.* at 190.

Applying these principles here, the changes to Code § 15.2-2204 do not retroactively apply to invalidate the public hearing that was properly advertised and began at the June 10

---

[7] Opinions of the Attorney General have also repeatedly recognized that, where recent public notice has been advertised for a hearing, it generally need not be provided again. 1972-73 Op. Va. Att'y Gen. at 489; 1991 Op. Va. Att'y Gen. at 6-7; 1996 Op. Va. Att'y Gen. at 65 n.10.

meeting. Because the advertising requirements attach only to the meeting where a public hearing begins, we do not need to decide whether the statute affects only procedural or also substantive rights—the relevant point in the process was over. So even to the extent that the statute states a new procedural rule, it did not apply mid-hearing. And the statute does not say it should apply retroactively to invalidate a hearing that properly started before the change in advertising requirements.

Here, the Planning Commission complied with the minimum advertising required for the June 10 meeting because notices ran on June 3 and June 10, as required by the then-effective version of the statute. *See* 2023 Va. Acts ch. 506 (amending Code § 15.2-2204(A)) (effective July 1, 2023). The public hearing on the Application began at the June 10 meeting and was then carried over to the July 8 meeting. The Planning Commission was not required to readvertise this fact, although it did provide optional additional notice anyway.[8] Because the public had notice that the Application would be considered in a public hearing that day, in compliance with the version of Code § 15.2-2204 in effect at the time, the Planning Commission was authorized to later make a recommendation on the pending application and the amendments to Code § 15.2-2204 do not apply retroactively to remove that authority. As noted above, nothing in the record suggests the continuance was intended to evade the notice requirements. Therefore, the trial court did not err in holding that readvertisement was not required for the July 8 hearing.[9]

---

[8] Code § 15.2-2204(A) sets only the minimum statutory requirements. A planning commission may always provide additional notice. *See* Code § 15.2-2205.

[9] Council and Developers suggest that we could dispose of this argument in a different way, under Code § 15.2-2285(B), which says that if a planning commission fails to report to a local governing body within 100 days of its first meeting after a zoning ordinance is referred to it, or a shorter period as prescribed by the local governing body, the planning commission's failure to act is deemed a recommendation. The City passed an ordinance requiring action by the Planning Commission with 60 days, and the Council and Developers argue that more than 60 days passed from when the Application was submitted to when the Planning Commission issued its recommendation, functionally mooting any issue from a purported failure to readvertise the

B.  Effect of the Application Amendment

Neighbors next argue that even if additional advertising was not required for the continued hearing, it was required when ABoone submitted an amended application between the Planning Commission's June and July meetings.  Neighbors have not pointed to any statutory language that requires readvertisement when an application is amended.  And we think Code § 15.2-2285 supports the opposite conclusion.  Subsection A of the statute states that a planning commission "shall hold at least one public hearing on a proposed ordinance or any amendment of an ordinance . . . *and may make appropriate changes in the proposed ordinance or amendment as a result of the hearing*."  Code § 15.2-2285(A) (emphasis added).  A local governing body may also "make appropriate changes or corrections in the ordinance or proposed amendment" following a public hearing.  Code § 15.2-2285(C).  Thus, the statutory scheme expressly contemplates that changes will be made following public hearings, without requiring the process to start all over again.  The only restriction is that "no land may be zoned to a more intensive use classification" than was originally provided for in the published notice without an additional hearing.  *Id.*

This is also consistent with the Supreme Court's observation that "[t]o find that every change resulting from continued negotiations between a developer and a locality requires an additional planning commission hearing would mean that 'the public hearing process may never come to a conclusion.'"  *Rowland v. Town Council of Warrenton*, 298 Va. 703, 720 (2020)

_____

July 8 meeting.  It is challenging to square how a planning commission can fail to act at all, and merely be deemed to have recommended an application, with the holding from *Potomac Greens* that a planning commission's imperfect action (following insufficient advertisement) renders any later approval by the local governing body void ab initio.  245 Va. at 378.  The Supreme Court did not discuss Code § 15.2-2285(B) in that case, likely because the application quickly proceeded through the local planning commission to the city council.  *Id.* at 374-75.  Because we conclude no readvertisement was required here, we leave this interesting argument for a future case.

(quoting *Arogas, Inc. v. Frederick Cnty. Bd. of Zoning Appeals*, 280 Va. 221, 227 (2010)). In *Rowland*, the planning commission recommended denial of a rezoning application after a hearing, and, based on the concerns expressed at the hearing, the applicants made several revisions before submitting the final application. *Id.* at 708-09. Town staff later recommended approval, noting that the outstanding issues were addressed, and the town council approved the rezoning. *Id.* at 709. The Supreme Court rejected the argument that an ordinance required the application to be resubmitted to the planning commission. *Id.* at 719-20. Important to the Court's decision was that the revised application "was substantially the same" as the one considered by the planning commission, and the amendments were adopted "for the express purpose of addressing the concerns raised during the review by that body." *Id.* at 720. If submission of a substantially similar application does not require a new meeting, it should not require readvertisement at a continued hearing.

Even taking as true their assertion that "substantive" changes demand readvertisement, Neighbors do not explain how the changes here rose to that standard. The amended Application slightly increased the tree canopy, revised the setbacks, altered the description of the buildings' siding, and added renderings of the exteriors of the townhomes. Despite Neighbors' conclusory assertion that the changes "were substantive," it is difficult to view such alterations as anything but de minimis, as the trial court concluded. *See Caparoula v. Bd. of Cnty. Supervisors of Prince William Cnty.*, No. 1137-24-4, slip op. at 2, 11, 2025 Va. App. LEXIS 545, at *2, 14 (Sept. 16, 2025) (noting that it was at least "fairly debatable" that changes concerning "an 85-acre public park" and a "$5 million contribution" "were not substantial in the context of the overall project").[10]

---

[10] While not binding precedent, "unpublished opinions may be cited as informative." *Coffman v. Commonwealth*, 67 Va. App. 163, 172 n.7 (2017) (citing Rule 5A:1(f)).

Furthermore, the amendments left the Application "substantially the same." *Rowland*, 298 Va. at 720. None of the changes were nearly as significant as a more intensive use classification. *See* Code § 15.2-2285(C). Additionally, classifying changes like these as "substantive" would risk making the hearing process indefinite. *See Rowland*, 298 Va. at 720. And ultimately, the public remained substantially aware of the Application's contents. *See Glazebrook v. Bd. of Supervisors*, 266 Va. 550, 555 (2003) ("[T]he intent of [Code § 15.2-2204(A)] is to generate informed public participation by providing citizens with information about the content of the proposed amendments and the forum for debate concerning those amendments."). Therefore, the trial court did not err in concluding that the statutory advertisement requirement was met.

III. The Council's decision to classify the Medmont Project as MXPUD was reasonable and within its authority.

Neighbors next argue that the trial court erred because the Medmont Project does not qualify as a mixed-use development or a planned unit development since it is purely residential, not "mixed residential/commercial." They concede that the City's "use table" categorized "townhouse dwelling, single-family dwelling, and home occupation (excluding personal services)" as distinct uses, but they argue that these definitions are artificially narrow compared to the way the zoning statutes define "uses" in a broad manner.[11] Because the parcels were erroneously rezoned, according to Neighbors, the action violated Dillon's Rule and renders the Council's approval of the project ultra vires and void ab initio. We disagree because the

---

[11] Neighbors also cursorily claim that the Medmont Project is not characterized by a "common open space" as defined by statute, "taking it outside the ambit of a MXPUD." But they offer no support for, or clarification of, that statement, nor do they address portions of the record that suggest the opposite. Because it is not the role of a court to develop an argument for a litigant, this particular argument is waived. *See Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017).

Medmont Project satisfied the definition of MXPUD, and the City was authorized to define "uses" by ordinance.

Starting first with the claim that the Medmont Project did not qualify as MXPUD, "[w]hen interpreting a statute or ordinance, 'our primary objective is "to ascertain and give effect to legislative intent," as expressed by the language used in the statute.'" *Berry v. Bd. of Supervisors*, 302 Va. 114, 127 (2023) (quoting *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 425 (2012)). "'[W]e determine [that] intent from the words contained in the statute' or ordinance." *Id.* at 128 (alterations in original) (quoting *Williams v. Commonwealth*, 265 Va. 268, 271 (2003)). "[W]ords in a statute [or ordinance] are to be construed according to their ordinary meaning, given the context in which they are used." *Id.* (alterations in original) (quoting *City of Va. Beach v. Bd. of Supervisors*, 246 Va. 233, 236 (1993)). Finally, "[w]hen addressing multiple legislative enactments dealing with the same subject matter, we do not view them 'as isolated fragments of law, but as a whole, or as parts of a great connected, homogeneous system, or a single and complete statutory arrangement.'" *Id.* (quoting *Thorsen v. Richmond SPCA*, 292 Va. 257, 266 (2016)).

The City's ordinance dealing with "Planned Unit Development Districts" contains several components. As relevant here, Roanoke City Code § 36.2-324(a) states that the "purposes of the MXPUD District are to encourage the orderly development of mixed residential/commercial sites and to encourage innovative development patterns that create a desirable environment, particularly for lots which contain a number of constraints to conventional development." "These regulations are designed to achieve" several other objectives, including the promotion of the "efficient use of land and infrastructure through high quality urban design," "a development pattern in harmony with existing development and the objectives of the City's Comprehensive

Plan," and "a compatible mix of commercial and residential uses," among other things. Roanoke City Code § 36.2-324(a).

The plain language of the MXPUD ordinance does not suggest that any one objective or purpose must be met. This contrasts with other sections of the ordinance that include mandatory language. *See* Roanoke City Code §§ 36.2-326, -328. If the City intended that any one objective or purpose must be met, it knew how to make that requirement clear. But even taking as true Neighbors' claim that the project is "purely residential,"[12] it may still "encourage innovative development patterns that create a desirable environment" and promote both an "efficient use of land and infrastructure through high quality urban design," and "a development pattern in harmony with existing development and the objectives of the City's Comprehensive Plan." *See* Roanoke City Code § 36.2-324(a).

Furthermore, the statutory definitions of mixed use and planned unit developments do not require that a particular development contain mixed residential and commercial sites. *See* Code § 15.2-2201. Instead, those definitions merely discuss "different uses," "a variety of housing types," and "a mix of building types and land uses." *See id.* These definitions may support the conclusion that the creation of "mixed residential/commercial sites" is a clear objective of Roanoke City Code § 36.2-324, but that exact mixture of uses is not strictly required to create an MXPUD. Therefore, the Medmont Project satisfies the definition of an MXPUD.

Next, we turn to the argument that whether the Medmont Project satisfied the ordinance's definition of MXPUD is irrelevant because the ordinance conflicts with the relevant statutes. To start, Code § 15.2-2201 provides definitions for the Code chapter on zoning "unless the context

---

[12] It is also worth noting that the trial court found that the buildings could be used for several non-exclusively residential uses, "such as short-term rentals, artist studios, or family day homes." Neighbors do not dispute this finding, and, if true, the project would not be "purely residential" as they claim. Rather, some level of commercial activity might occur therein.

requires a different meaning." The statute defines "Mixed use development" as "property that incorporates two or more different uses, and may include a variety of housing types, within a single development." Code § 15.2-2201. A "Planned unit development," on the other hand, is

> a form of development characterized by unified site design for a
> variety of housing types and densities, clustering of buildings,
> common open space, and a mix of building types and land uses in
> which project planning and density calculation are performed for
> the entire development rather than on an individual lot basis.

*Id.*

Other statutory provisions deal more directly with a locality's zoning authority. As relevant here, Code § 15.2-2280 provides that a locality "may regulate, restrict, permit, prohibit, and determine . . . [t]he use of land, buildings, structures and other premises for agricultural, business, industrial, residential, flood plain and other specific uses." Code § 15.2-2286(A)(9) states that "[a] zoning ordinance may include, among other things, reasonable regulations and provisions as to . . . areas and districts designated for mixed use developments or planned unit developments as defined in § 15.2-2201."

Neighbors find conflict between Code § 15.2-2280 and the City's ordinances where there is none. Code § 15.2-2280 indeed describes "uses" in general categories—"agricultural, business, industrial, residential, flood plain." But it also provides for "other specific uses." Code § 15.2-2280. Based on the plain text of the statute, other "specific uses" may exist beyond just those listed therein. Furthermore, the purpose of Code § 15.2-2280 is to authorize localities to zone the territory in their jurisdiction by ordinance. *See Schefer v. City Council of Falls Church*, 279 Va. 588, 593 (2010) (finding that, through the statute, "the General Assembly has authorized any locality by ordinance to zone the territory in its jurisdiction"). Nothing suggests that the statute was intended to limit "uses" to the general, enumerated categories.

"A municipal ordinance is invalid under Dillon's Rule if it exceeds the scope of authority granted by statute, or is inconsistent with a statute such that the ordinance and statute cannot coexist." *Bragg Hill Corp.*, 297 Va. at 578. "The fact that a county or municipal ordinance enlarges on a statute's provisions does not create a conflict with the statute unless the statute limits the requirements *for all cases* to its own terms." *Id.* (quoting *W. Lewinsville Heights Citizens Ass'n v. Bd. of Supervisors*, 270 Va. 259, 266 (2005)). And "[i]f an enabling statute and an ordinance can both be given effect, we 'harmonize them and apply them together.'" *Id.* at 578-79 (quoting *W. Lewinsville Heights*, 270 Va. at 266). Finally, "legislative decisions in zoning matters are 'presumed valid and will not be altered by a court absent clear proof that the action is unreasonable, arbitrary, [or] bears no reasonable relation to the public health, safety, morals, or general welfare.'" *Rowland*, 298 Va. at 718 (alteration in original) (quoting *EMAC*, 291 Va. at 21).

Putting these pieces together, the City was authorized to set out distinct classes of "uses" for the purposes of each classification. Code § 15.2-2201 provides general definitions for each classification, but, as Neighbors themselves concede, no definition of "use" is provided. Localities are clearly authorized to enact ordinances that "regulate" and "determine" the "use of land." Code § 15.2-2280. This authority is made even more explicit by Code § 15.2-2286(A)(9), which allows for "reasonable regulations and provisions" related to mixed use and planned unit developments. Although Neighbors describe the distinctions in the "use table" as "barely distinguishable categories," they do not contend that such distinctions are unreasonable, nor do they offer any argument to overcome the presumption of reasonableness. Nor are the distinctions plainly inconsistent with the statutory definitions of mixed use and planned unit developments, which do not themselves define "uses." *See* Code § 15.2-2201.

In the end, the statutory framework does not preclude localities from defining more specific "uses" for the purpose of mixed use and planned unit developments as Neighbors here contend. And the trial court did not err in concluding that the Medmont Project fit the City's MXPUD ordinance.

IV. The Council's decision was fairly debatable.

Finally, Neighbors argue that they carried their burden to produce probative evidence of unreasonableness to overcome the presumption of validity of the rezoning, and, alternatively, that the Council and Developers did not present sufficient evidence to make rezoning "fairly debatable." Assuming without deciding that Neighbors produced such evidence of unreasonableness, the Council and Developers presented sufficient evidence to make the issue at least fairly debatable.[13]

"Legislative actions, such as the grant or denial of an application for rezoning, are presumed to be reasonable both upon review before the circuit court and upon appeal." *Hartley v. Bd. of Supervisors*, 80 Va. App. 1, 15 (2024). "Legislative action is reasonable if the matter in issue is fairly debatable," meaning that "the evidence offered in support of the opposing views would lead objective and reasonable persons to reach different conclusions." *Bd. of Supervisors v. Robertson*, 266 Va. 525, 532 (2003) (first quoting *Bd. of Supervisors v. Lerner*, 221 Va. 30, 34

---

[13] Neighbors generally assign error to the circuit court's conclusion that the issue was fairly debatable, but in briefing, cite several specific reasons in support of this argument: that the Council 1) relied on misleading evidence from the Report; 2) failed to give adequate consideration to the Greater Deyerle Neighborhood Plan; 3) failed to reasonably consider fire safety and the Medmont Project's lack of compatibility with the Virginia Statewide Fire Prevention Code; and 4) failed to reasonably consider the effect of the Medmont Project on wetlands. Because the assignment of error only addresses whether the issue was fairly debatable, we do not address each of these sub-arguments in detail and examine only whether there was evidence making the issue fairly debatable. *See Banks v. Commonwealth*, 67 Va. App. 273, 289-90 (2017) (We are "limited to reviewing the assignments of error presented by the litigant" and thus will "not consider issues touched upon by the appellant's argument but not encompassed by his assignment of error.").

(1980); and then quoting *Bd. of Supervisors v. Williams*, 216 Va. 49, 58 (1975)). The following

burden-shifting framework determines whether the presumption of reasonableness prevails:

> Where presumptive reasonableness is challenged by probative
> evidence of unreasonableness, the challenge must be met by some
> evidence of reasonableness. If evidence of reasonableness is
> sufficient to make the question fairly debatable, the [legislative
> action] "must be sustained." If not, the evidence of
> unreasonableness defeats the presumption of reasonableness and
> the [legislative action] cannot be sustained.

*Id.* at 533 (alterations in original) (quoting *Bd. of Supervisors v. Snell Constr. Corp.*, 214 Va.

655, 659 (1974)). "Under the fairly debatable standard, 'the question is whether there is *any*

*evidence in the record sufficiently probative* to make a fairly debatable issue of the [Council's]

decision.'" *Hartley*, 80 Va. App. at 15 (quoting *Town of Leesburg v. Giordano*, 280 Va. 597,

608 (2010)). And because we presume that the Council "was 'cognizant at the time it acted of

all existing facts and circumstances bearing upon the public policies and private rights relating to

their action,'" "we may consider evidence of reasonableness in the pleadings, exhibits, and

admissions—even if it was not before the [Council] in the legislative record." *Id.* at 19 (quoting

*Indus. Dev. Auth. v. La France Cleaners & Laundry Corp.*, 216 Va. 277, 282 (1975)).[14]

---

[14] Neighbors assert that *Hartley* was wrongly decided insofar as it misread *La France* to "create[]" such a "presumption." But as we explained in *Oak Valley I*:

> [I]n evaluating *reasonableness*, we "look not to what a legislative
> body was told or to what it knew when it acted, but to what it could
> have known at that time." That is why courts "may consider
> evidence of reasonableness in the pleadings, exhibits, and
> admissions—even if it was not before the Board in the legislative
> record." In other words, "[i]t is not our place to judge the quality
> of the care and deliberation that went into this or any other law."
> "A law enacted by voice vote with no deliberation whatever is
> fully as binding upon us as one enacted after years of study,
> months of committee hearings, and weeks of debate."

85 Va. App. at 397-98 (second alteration in original) (first quoting *La France*, 216 Va. at 282; then quoting *Hartley*, 80 Va. App. at 19; and then quoting *King v. Burwell*, 576 U.S. 473, 516

Several statutes are relevant as well. Code § 15.2-2283 provides, "Zoning ordinances shall be for the general purpose of promoting the health, safety or general welfare of the public . . . . To these ends, such ordinances shall be designed to give reasonable consideration to" certain enumerated "purposes, where applicable." The statute then lists numerous purposes, ranging from the provision of "adequate light, air, convenience of access, and safety from fire, flood, impounding structure failure, crime and other dangers," to the encouragement of economic development and the promotion of affordable housing. *See* Code § 15.2-2283. Code § 15.2-2284, on the other hand, requires that zoning ordinances be "drawn and applied with reasonable consideration for" several other factors, including the existing use of the property, the comprehensive plan, transportation requirements, "trends of growth or change," and more.

Our Supreme Court addressed whether a local governing body satisfied the "fairly debatable" standard in *City Council v. Wendy's of West Virginia*, 252 Va. 12, 15 (1996). There, the appellee sought to rezone the subject property from single family residential for use as a restaurant. *Id.* at 13-14. The city council denied the request, but the trial court found that denial to be arbitrary and capricious because the evidence showed that the change was reasonable. *Id.* at 14. After assuming that "the owner presented probative evidence of the reasonableness" of rezoning and the "unreasonableness" of the existing zoning, the Supreme Court reversed the trial court. *Id.* at 15. The evidence in support of the reasonableness of rezoning there included the uses of the surrounding areas, the history of the parcel, and expert testimony that "the subject property 'is not suitable for residential use.'" *Id.* at 15-16. In addition, the city put on evidence, which "principally came from two expert witnesses," including "the City's director of planning and development," that the current zoning was reasonable. *Id.* at 16-18. The experts described

(2015) (Scalia, J., dissenting)). This presumption is not a product of misreading precedent; it is derived from the unique roles of the legislative and judicial branches.

the nature of the community, its current "stress" levels, rental values, and a potential "domino-type effect" if rezoning was permitted, among other things. *Id.* Dozens of residents expressed opposition to rezoning as well. *Id.* at 17. The Court found that the evidence "[c]learly" was "sufficient to make the issue fairly debatable," noting that the city sought to protect the existing neighborhood, and it adhered to its comprehensive plan. *Id.*

Our recent decision in *Hartley* is also illuminating. Hartley challenged the decision of the local board to rezone several acres to allow for the development of a Dollar General store. 80 Va. App. at 9-10, 13. Despite assuming that Hartley produced probative evidence of unreasonableness, we still found that "the Board met its burden to put forward 'some evidence of reasonableness' in response." *Id.* at 22 (quoting *Snell Constr. Corp.*, 214 Va. at 659). For starters, the decision "mirrored the recommendation of the Planning Commission." *Id.* The board also received a letter from counsel for the applicant outlining potential economic benefits of rezoning. *Id.* Public comments expressed opposition to and support of rezoning. *Id.* And though Hartley alleged traffic dangers, VDOT did not oppose rezoning. *Id.* Ultimately, these factors "suggest[ed] that reasonable people, evaluating the statutory charges to 'facilitate the creation of a convenient, attractive and harmonious community' and 'encourage economic development,' and balancing them against concerns about light, convenience, and traffic congestion, could disagree as to whether to rezone the property." *Id.* (quoting Code § 15.2-2283).

Turning back to this case, there is evidence of reasonableness that makes the issue at least fairly debatable. To start, at the July 15 meeting, ABoone's representative described efforts to work with the City to "improve housing opportunities in the City." Among other things, the representative discussed the challenges of building affordable, single-family homes and noted that townhomes present a "less expensive" option. This is comparable to *Hartley*, where counsel

for the applicant submitted a letter detailing potential economic benefits of rezoning.  *See* 80 Va. App. at 22.  And although most of the residents who spoke at the meeting opposed the Medmont Project, not every speaker was opposed.  In both *Wendy's* and *Hartley*, evidence of some public opinion in support of the projects was cited as evidence of reasonableness.  252 Va. at 17; 80 Va. App. at 22.  The Planning Commission's Report recommending approval of the Medmont Project discussed aspects of rezoning, like stormwater, traffic, and tree canopy requirements, while noting that any remaining issues would be addressed later in the review process.  At the very least, this reasonably supports the conclusion that the Council was aware of, and considered, several factors listed in Code § 15.2-2283.

Finally, the Report detailed the ways in which the Medmont Project would comply with the Greater Deyerle Neighborhood and Comprehensive Plans.  Again, we cited the same as evidence of reasonableness in *Hartley*.  80 Va. App. at 22.  Indeed, portions of both plans reasonably support the rezoning.  For example, the Greater Deyerle Neighborhood Plan sets out the goal to "[m]aintain the existing general land use patterns, *while giving greater consideration to specific zoning changes per the recommendations of this plan*."  (Emphasis added).  The plan then describes the need to offer "a broad array of housing options" and to "plan for future growth."  The plan also details property that might be rezoned to MXPUD.  Viewed as a whole, this plan arguably supports rezoning single-family lots to MXPUD to increase housing options, which is what the Application purported to do.

The Comprehensive Plan, for its part, describes several "Big Ideas."  These ideas include, among other things, offering "a wide range of housing options within or in close proximity to" commercial areas, schools and places of worship, and open spaces; accommodating "[m]iddle housing" that is an alternative to single-family dwellings; and "[u]sing our [l]and [b]etter."  Several more specific priorities in the Comprehensive Plan include the creation of transitions

between commercial centers and residential areas and increased diversity of housing types. The Medmont Project arguably advances these goals and priorities by offering alternative housing options located next to a large medical center. And as our appellate courts have repeatedly stated, whether rezoning complies with the comprehensive plan is ultimately a matter within the local body's discretion. *Wendy's*, 252 Va. at 18; *Hartley*, 80 Va. App. at 17-18.

Adding up the evidence of the statements at the July 15 meeting, the Report, and the plans, we find that there is evidence in the record rendering the rezoning decision at least fairly debatable. As a result, the trial court did not err.

## CONCLUSION

For these reasons, we affirm the trial court's judgment.

*Affirmed*.